780 F.2d 963
 12 Soc.Sec.Rep.Ser. 115, Medicare&Medicaid Gu 35,090
Douglass G. WHITNEY, M.D., W.D. Jordan, M.D., and Fred
Shessel, M.D., Plaintiffs-Appellants,
v.
Margaret M. HECKLER, Secretary of the Department of Health
and Human Services, Defendant-Appellee.
 No. 85-8129.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 22, 1986.
 
 Kent Masterson Brown, Lexington, Ky., Henry Angel, Michael Jablonski, Atlanta, Ga., for plaintiffs-appellants.
 Anthony J. Steinmeyer, Douglas Letter, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.
 Appeal from the United States District Court For the Northern District of Georgia.
 Before RONEY and ANDERSON, Circuit Judges, and MORGAN, Senior Circuit Judge.
 ANDERSON, Circuit Judge:
 
 
 1
 Douglass G. Whitney, M.D., W.D. Jordan, M.D., and Fred Shessel, M.D. ("appellants") appeal from the judgment of the district court upholding the constitutionality of certain provisions of Sec. 2306 of the Deficit Reduction Act of 1984, 42 U.S.C.A. Sec. 1395u(b)(4), (h)-(j) (West Supp.1985). See Whitney v. Heckler, 603 F.Supp. 821 (N.D.Ga.1985). Appellants make two primary arguments on appeal: (1) that the fifteen-month freeze on the fees that non-participating physicians may charge their Medicare patients violates substantive due process,[1] and (2) that the civil penalties for non-participating physicians who raise their fees to Medicare beneficiaries during the fifteen-month freeze and the various incentives provided for doctors to become participating physicians constitute a bill of attainder prohibited by Art. I, Sec. 9 of the United States Constitution. We affirm.
 
 I. BACKGROUND
 
 2
 In 1965, Congress enacted the Medicare program as Subchapter XVIII of the Social Security Act. This program is divided into two parts. Part A provides reimbursement for covered hospital and related services. 42 U.S.C. Secs. 1395c-1395i (1982). Part B establishes a voluntary program of supplemental medical insurance benefits for certain medical services, including physicians' services. Id. Secs. 1395j-1395w. This case involves Part B exclusively.
 
 
 3
 Under Part B, Medicare enrollees obtain benefits in return for the payment of monthly premiums in an amount determined by the Secretary of Health and Human Services. Id. Sec. 1395r. These premiums and contributions from the federal government make up the Federal Supplementary Medical Insurance Trust Fund, out of which payment is made for Part B benefits. Id. Sec. 1395t.
 
 
 4
 Part B enrollees are generally entitled to receive 80% of the "reasonable charge" for medical services. Id. Sec. 1395l. This "reasonable charge" is computed according to a formula provided by Sec. 1395u(b). Under this section, a physician's actual billed charge for each service is compared with what he customarily charges for that service (the "customary charge"), and with the charge made for similar services by most doctors in the locality (the "prevailing charge"), and the "reasonable charge" is the lowest of these three.[2]
 
 
 5
 Prior to the enactment of the Deficit Reduction Act of 1984, a Part B enrollee could pay for medical services in one of two ways. The beneficiary could pay the physician directly and then request reimbursement from Medicare. Id. Sec. 1395u(b)(3)(B)(i). Alternatively, if a physician were willing, the beneficiary could assign to the physician the beneficiary's right to reimbursement. Id. Sec. 1395u(b)(3)(B)(ii). The physician, as the beneficiary's assignee, then collected payment directly from Medicare.
 
 
 6
 Under this program, Medicare's "customary" and "prevailing" charge data were updated each year on July 1 based on the prior year's data. Physicians were also permitted to accept or decline assignment on a claim-by-claim basis, and if a physician chose not to accept assignment, Medicare placed no limitation on the amount that he could charge a Part B enrollee. Patients of physicians not accepting assignment, however, received Medicare reimbursement only for the 80% of Medicare's "reasonable charge," and the beneficiary was responsible for the difference between that figure and the physician's actual charge.
 
 
 7
 The Deficit Reduction Act of 1984 made several changes in physician reimbursement under Medicare Part B.[3] First, Sec. 2306(a) freezes both the "prevailing" and "customary" charge levels for a fifteen-month period beginning July 1, 1984, at levels no higher than the levels that were set for the twelve-month period beginning July 1, 1983. 42 U.S.C.A. Sec. 1395u(b)(4) (West Supp.1985).[4] In addition to this freeze, Sec. 2306(c) requires physicians to decide before October 1 of each year whether they will be "participating" or "non-participating" doctors for that year. 42 U.S.C.A. Sec. 1395u(h) (West Supp.1985).[5] A "participating" physician agrees to accept payment on an assignment basis for services furnished to Medicare beneficiaries during the twelve-month period beginning October 1. Thus, a "participating" physician's fees are effectively limited to the "reasonable" charge. Id. Sec. 1395u(b)(3)(B). A "non-participating" physician, however, may still continue to accept assignment on a case-by-case basis.
 
 
 8
 Section 2306(c) also provides that a non-participating physician may not charge a Medicare patient in excess of the physician's actual charges for the calendar quarter beginning on April 1, 1984. 42 U.S.C.A. Sec. 1395u(j) (West Supp.1985). There is no restriction on fees charged to patients who do not receive Medicare assistance. This subsection also requires the Secretary to monitor each non-participating physician's actual charges to Medicare beneficiaries, and if the physician "knowingly and willfully bills ... [beneficiaries] for actual charges in excess of such physician's actual charges for the calendar quarter beginning on April 1, 1984," the Secretary may bar such physician from participation in the Medicare Program for a period of up to five years and/or impose a civil penalty of up to $2,000 for each violation. Id. Sec. 1395u(j)(1), (2).
 
 
 9
 Finally, Sec. 2306 also provides several incentives for physicians to become "participating" doctors. Under subsections 1395u(h)(2), 1395u(h)(3) and 1395u(j), the Secretary is required to: (1) publish a directory of participating physicians, which is to be made available to Medicare enrollees; (2) maintain a toll-free number for enrollees to obtain the names and specialties of participating physicians; (3) publish a list of the percentage of patients accepted by each physician on an assignment basis; and (4) provide for electronic receipt of claims from participating physicians so that their claims can be processed more rapidly. In addition, subsection 1395u(b)(4)(D) specifies that in determining the customary charges of "non-participating" physicians for the twelve-month periods beginning October 1, 1985 and October 1, 1986, the Secretary shall not "recognize increases in actual charges for services furnished" during the fifteen-month freeze period. The increase in "participating" physicians' actual charges, however, will be recognized by the Secretary in computing their customary charge levels once the freeze is lifted.
 
 
 10
 In September 1984, appellants, who are practicing physicians in the Atlanta, Georgia area, filed suit seeking a temporary restraining order to stay operation of Sec. 2306 before they had to elect in October 1984 whether to become "participating" physicians for the upcoming year. They contended that the temporary freeze on the fees that non-participating physicians could charge Part B enrollees, the possible civil penalties for violation of the freeze, the requirement that the Secretary monitor their billing practices, and the exclusion of non-participating physicians from the lists of doctors made available to Medicare enrollees violated the Fifth Amendment to the Constitution and constituted a bill of attainder prohibited by Article I, Sec. 9 of the Constitution. The district court denied both their motion for a temporary restraining order and their request for a stay pending appeal.
 
 
 11
 In October, appellants filed an amended complaint alleging, inter alia, that they did not elect to become "participating" physicians under the Deficit Reduction Act prior to October 1, 1984, that they planned to raise their fees to their patients covered by Medicare Part B within the fifteen-month period beginning July 1, 1984, that 50-60% of their patients are Medicare Part B enrollees, and that 85% of these patients have supplemental health insurance. After a hearing, the district court granted judgment for the Secretary, upholding the constitutionality of Sec. 2306. See Whitney, 603 F.Supp. at 825-29. First, the district court concluded that Sec. 2306 was not a deprivation of due process because the legislation is a "reasonable" means for Congress to reduce federal spending without shifting the burden of cost reduction to the Medicare beneficiaries. Id. at 825-26. The district court also rejected appellants' contention that the fee freeze and incentive provisions constituted a taking in violation of the Fifth Amendment, reasoning that there is no unconstitutional taking of property in the instant case because the regulated action is voluntary--i.e., appellants can simply decline to treat Medicare patients if they wish to avoid federal regulation. Id. at 826-27. Finally, the court held that Sec. 2306 is not a bill of attainder because this section cannot reasonably be construed as a legislative determination of guilt and imposition of punishment. Id. at 827-29.
 
 II. FIFTH AMENDMENT CHALLENGES
 
 12
 A. Substantive Due Process Challenge to the Fee Freeze
 
 
 13
 Appellants' principal contention on appeal is that the fifteen-month freeze on the fees non-participating physicians may charge their Medicare patients deprives them of their property in violation of the Due Process Clause of the Fifth Amendment.[6] Appellants concede that Congress has the power to regulate medical services and charges, Appellants' Brief at 23-25, but nevertheless insist that in doing so, Congress must provide an administrative mechanism to ensure that all doctors are guaranteed a "reasonable" profit. Since Congress has not established such a regulatory board in this case, they argue that their substantive due process rights have been violated. We disagree.
 
 
 14
 The test for determining whether economic and social regulation meets substantive due process requirements is well established: "[i]f the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied...." Nebbia v. New York, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934); see also North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc., 414 U.S. 156, 164-67, 94 S.Ct. 407, 412-14, 38 L.Ed.2d 379 (1973); In re Permian Basin Area Rate Cases, 390 U.S. 747, 769-70, 88 S.Ct. 1344, 1361-62, 20 L.Ed.2d 312 (1968). The Supreme Court has repeatedly emphasized that the judicial role in analyzing due process challenges to economic and social regulation is a limited one:
 
 
 15
 The Oklahoma law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement.... It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.
 
 
 16
 The day is gone when this court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought....
 
 
 17
 Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 487-88, 75 S.Ct. 461, 464-65, 99 L.Ed. 563 (1955). See also Ferguson v. Skrupa, 372 U.S. 726, 729-32, 83 S.Ct. 1028, 1030-32, 10 L.Ed.2d 93 (1963); Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 423, 72 S.Ct. 405, 407, 96 L.Ed. 469 (1952); Nebbia, 291 U.S. at 537-38, 54 S.Ct. at 516. With these principles in mind, we began our analysis of the constitutionality of the temporary fee freeze.
 
 
 18
 By enacting Sec. 2306, Congress intended to accomplish two objectives. First, in order to curtail the increase in the federal deficit, Congress froze the "customary" and "prevailing" charges for physician's services during the fifteen-month period from July 1, 1984 to September 30, 1985. See, e.g., 130 Cong.Rec.S. 8373, 8375 (daily ed. June 27, 1984) (Sen. Dole) ("Under Sec. 2306, $2.5 billion will be saved by freezing for fifteen months the customary and prevailing charge levels used to determine what medicare will pay for physicians' services."), reprinted in 1984 U.S.Code Cong. & Ad.News 2151, 2156 (hereafter "Legislative History"). In addition, Congress was concerned that non-participating physicians would make up any profits lost as the result of the freeze by raising their actual charges to Medicare enrollees. See, e.g., H.R.Conf.Rep. No. 861, 98th Cong., 2d Sess. 757, 1314 (1984) (hereafter "H.R.Conf.Rep. No. 98-861"), reprinted in Legislative History at 2002; 130 Cong.Rec.H. 7085, 7086 (daily ed. June 27, 1984) (Rep. Rostenkowski), reprinted in Legislative History at 2144. In order to prevent non-participating physicians from shifting the burden of the freeze to Medicare beneficiaries, Congress placed a ceiling on the amount non-participating physicians could charge their Medicare beneficiaries.[7] As Senator Dole, Chairman of the Senate Committee on Finance, explained:
 
 
 19
 [T]here has been a great deal of concern about how physicians can be prevented from shifting the burden of such a freeze to beneficiaries. Simply freezing what we pay for physician services provides little protection to program beneficiaries. If a physician does not elect to take assignment, beneficiaries can be held responsible for the full difference between what the program pays and what the physician charges.
 
 
 20
 [T]he conferees spent a great deal of time in discussions with the administration trying to address this concern. As a result, the conferees agreed to a [temporary fee freeze] provision which works in concert with organized medicine's voluntary freeze.
 
 
 21
 130 Cong.Rec. at S. 8375, reprinted in Legislative History at 2156. Accord H.R.Conf.Rep. No. 98-861 at 1314, reprinted in Legislative History at 2002; 130 Cong.Rec.H. 7085, 7086 (daily ed. June 27, 1984) (Rep. Rostenkowski), reprinted in Legislative History at 2144.
 
 
 22
 The legislative history reveals that the temporary fee freeze provision was carefully drawn in order to accomplish these two objectives--to reduce the federal deficit without placing the burden of such reduction solely on Medicare beneficiaries. The fee freeze is based on each physician's charges for similar services in the quarter immediately preceding the freeze (i.e., charges for the quarter beginning April 1, 1984). Thus, the fee ceiling is not arbitrary.
 
 
 23
 Congress also intended this freeze "to work in concert with the efforts--which are to be commended--of the American Medical Association and many individual medical societies which have urged their members voluntarily to freeze their fees." 130 Cong.Rec.H. 7085, 7086 (daily ed. June 27, 1984) (Rep. Rostenkowski), reprinted in Legislative History at 2144; see also H.R.Conf.Rep. No. 98-861 at 1314 ("[I]n light of the efforts of many medical societies that have urged their members to voluntarily freeze their fees ..., the Conferees believe that this provision will work in concert with those efforts ....."), reprinted in Legislative History at 2002.
 
 
 24
 Significantly, the fee freeze is a temporary measure based upon what each physician actually charged Medicare beneficiaries during the April 1, 1984 quarter.[8] During the fifteen-month freeze, the Secretary of Health and Human Services is required to study the issue of medical services provided to Medicare enrollees and to make recommendations for the future "in sufficient detail to serve as the basis for legislative action which Congress can take to assure that any burden of effectively constraining the growth of cost in the Medicare Part B program, which Congress intends to be borne by providers and physicians, is not transferred (in whole or in part) so as to become an additional burden on Part B beneficiaries in the form of increased out-of-pocket costs, reduced services, or reduced access to needed physician care." Deficit Reduction Act of 1984, Pub.L. No. 98-369, Sec. 2306(d), 98 Stat. 494, 1072.
 
 
 25
 Under these circumstances, we hold that Congress could reasonably determine that a temporary fee freeze, pending the preparation of a more comprehensive program, was necessary in order to prevent Medicare beneficiaries from bearing the burden of the reduction in Medicare expenditures.
 
 
 26
 In Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Department of Public Welfare, 742 F.2d 442 (8th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985), the Eighth Circuit upheld the constitutionality of a similar statute. In that case, Minnesota had enacted a statute limiting the rates which nursing homes participating in the Medicaid program may charge patients who do not receive Medicaid benefits. The Minnesota Association of Health Care Facilities contended that the regulation of the fees its members could receive from private sources violated the requirements of substantive due process. The Eighth Circuit, however, found that the Minnesota statute satisfied these requirements because "[t]he Minnesota legislature could reasonably find that differences in rates for the same nursing home services, depending wholly upon whether or not a resident receives medical assistance, are inimical to the public welfare, and thus it could properly choose to regulate the rates that nursing homes participating in Medicaid charge the residents who do not receive medical assistance." Id. at 447. Similarly, Congress determined in the instant case that limiting the increase in Medicare payments without also limiting the total fees that may be charged to Medicare beneficiaries would be harmful to the public welfare because it would place the burden of cost reductions solely upon Medicare beneficiaries.[9]
 
 
 27
 Appellants argue, however, that in order to regulate physicians' fees (i.e., to fix the fees), Congress must establish a regulatory mechanism to set standards in such a way that all physicians can make a "reasonable" profit. As stated above, the due process test is whether the law has a reasonable relation to a proper legislative purpose, and is neither arbitrary nor discriminatory. Under the particular facts and circumstances of this case, we conclude that the legislative purposes are legitimate--i.e., to control federal spending in order to alleviate deficit problems, and to promote the public welfare by precluding physicians from shifting the burden of the reductions onto Medicare beneficiaries--and we conclude that the means chosen by Congress are not unreasonable--i.e., the fees are fixed at what this physician himself charged in the recent past (the quarter immediately preceding the freeze period), and the freeze is temporary pending a study which can form the basis for more permanent legislation. Under these circumstances, we hold that due process does not require Congress to follow the ratemaking procedures suggested by appellants. We are not confronted with the issue of whether due process would require ratemaking or other such procedures in the case of permanent legislation,[10] and we express no opinion thereon.[11]
 
 B. Other Fifth Amendment Arguments
 
 28
 Appellants raise two other Fifth Amendment challenges that warrant only brief discussion. First, appellants argue that the temporary freeze on their actual charges to Medicare patients constitutes a taking of their property without just compensation in violation of the Fifth Amendment. This contention, however, lacks merit. It is well established that government price regulation does not constitute a taking of property where the regulated group is not required to participate in the regulated industry. See, e.g., Bowles v. Willingham, 321 U.S. 503, 517-18, 64 S.Ct. 641, 648-49, 88 L.Ed. 892 (1944) (rent controls do not constitute prohibited taking because statute did not require landlords to offer their apartments for rent); Minnesota Ass'n of Health Care Facilities, Inc., 742 F.2d at 446 (state statute limiting fees nursing homes participating in Medicaid Program may charge to non-Medicaid patients is not taking within meaning of the Fifth Amendment because "the state does not require that nursing homes admit medical assistance residents and participate in the Medicaid Program"). In the instant case, appellants are not required to treat Medicare patients, and the temporary freeze is therefore not a taking within the meaning of the Fifth Amendment.[12]
 
 
 29
 Appellants' next contention is that the temporary fee freeze and the federal monitoring of non-participating physicians' billing practices infringe the liberty of contract protected by the Due Process Clause of the Fifth Amendment.[13] We find this claim to be totally lacking in merit. In order for the challenged provisions to infringe appellants' liberty of contract, they must bear no rational relationship to any legitimate purpose of the Deficit Reduction Act of 1984. See, e.g., West Coast Hotel Co. v. Parrish, 300 U.S. 379, 391-92, 57 S.Ct. 578, 581-82, 81 L.Ed. 703 (1937). As discussed above, the temporary fee freeze is rationally related to legitimate congressional objectives. Moreover, federal monitoring of the billing practices of non-participating physicians is a reasonable means for determining whether these physicians are complying with the temporary freeze.
 
 III. BILL OF ATTAINDER CHALLENGE
 
 30
 Appellants' final contention is that the incentives in Sec. 2306 for physicians to become participating physicians (providing Medicare enrollees with lists of the specialties and phone numbers of participating physicians, more efficient processing of claims and the recognition of increased billing charges to non-Medicare patients in future calculations of participating physicians' "customary" charges) and the statutory enforcement mechanism (civil fines and/or barring non-participating physicians from treating Medicare patients for a period of up to five years) constitute a bill of attainder prohibited by Article I, Sec. 9 of the United States Constitution.[14]
 
 
 31
 A bill of attainder has been defined as a " 'law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.' " Selective Service System v. Minnesota Public Interest Research Group, --- U.S. ----, 104 S.Ct. 3348, 82 L.Ed.2d 632, 640 (1984) (quoting Nixon v. Administrator of General Services, 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977)). In determining whether a statute is a bill of attainder, the Supreme Court has cautioned that "[t]he judicial function is 'not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations.' " Selective Service System, --- U.S. at ----, 104 S.Ct. at 3355, 82 L.Ed.2d at 642 (quoting CSC v. Letter Carriers, 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973)). Because we find that Sec. 2306 does not inflict "punishment" forbidden by Article I, Sec. 9 of the Constitution, we hold that it is not a constitutionally prohibited bill of attainder.
 
 
 32
 A statute inflicts constitutionally forbidden punishment if (1) the statutory penalty falls within the historical meaning of legislative punishment, (2) the statute fails to further any nonpunitive legislative purpose, or (3) the legislative history establishes a congressional intent to punish. See, e.g., Selective Service System, --- U.S. at ----, 104 S.Ct. at 3355, 82 L.Ed.2d at 643; Nixon, 433 U.S. at 475-76, 97 S.Ct. at 2806-07. The civil penalty and incentive provisions do not run afoul of the foregoing guideposts. First, the challenged civil penalty and incentive provisions do not fall within the historical meaning of legislative punishment. In upholding the constitutionality of a statute denying federal financial assistance under the Higher Education Act of 1965 to students who fail to register for the military draft, the Supreme Court reasoned that the "mere denial of a noncontractual governmental benefit" did not approach the penalties traditionally associated with bills of attainder.[15] Selective Service System, --- U.S. at ----, 104 S.Ct. at 3356, 82 L.Ed.2d at 644; see also Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960) (The disqualification of certain deportees from receipt of Social Security benefits does not constitute a bill of attainder because "the sanction is the mere denial of a noncontractual governmental benefit. No affirmative disability or restraint is imposed, certainly nothing approaching the 'infamous punishment' of imprisonment ....."). Similarly, the challenged provisions in the instant case--the civil enforcement mechanism and the incentives for doctors to become "participating" physicians--do not impose the punishment historically associated with bills of attainder but rather are simply examples of statutory civil penalties frequently enacted to aid the executive branch in the enforcement of the law. See, e.g., Zwick v. Freeman, 373 F.2d 110, 119-20 (2d Cir.) (statute prohibiting licensee from employing, without government approval, any person responsibly connected with anyone found to have committed flagrant or repeated violations of the unfair conduct provisions of Perishable Agricultural Commodities Act is not bill of attainder), cert. denied, 389 U.S. 835, 88 S.Ct. 43, 19 L.Ed.2d 96 (1967); Bearden v. Commissioner, 575 F.Supp. 1459, 1462 (D.Utah 1983) (statute prescribing $500 penalty for filing of frivolous tax return does not constitute bill of attainder).[16]
 
 
 33
 With respect to the second and third prongs of the test, the legislative history convincingly establishes that Sec. 2306 was intended to further nonpunitive goals, not to punish nonparticipating physicians. As discussed above, the temporary freeze was intended to prevent Medicare beneficiaries alone from bearing the burden of reduced Medicare expenditures. Moreover, the various incentive provisions of Sec. 2306 were designed to encourage physicians to participate in the Medicare program and to provide beneficiaries with the information necessary to obtain the services of physicians who would not charge them more than the "reasonable" rate recognized by Congress.[17] Neither the text of Sec. 2306 nor its legislative history suggests that Sec. 2306 was intended to "punish" physicians who elect not to "participate" in the Medicare program. Under these circumstances, we hold that Sec. 2306 does not constitute a bill of attainder prohibited by the Constitution.[18]IV. CONCLUSION
 
 
 34
 For the foregoing reasons, the judgment of the district court is therefore
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 Appellants also challenge the statute on two other Fifth Amendment grounds, i.e., that it constitutes a taking of their property without just compensation and infringes their liberty of contract. As we indicate in the text below, these grounds are also without merit
 
 
 [2]
 Sec. 1395u(b)(3) provides in relevant part:
 In determining the reasonable charge for services for purposes of this paragraph, there shall be taken into consideration the customary charges for similar services generally made by the physician or other person furnishing such services, as well as the prevailing charges in the locality for similar services. No charge may be determined to be reasonable in the case of bills submitted or requests for payment made under this part after December 31, 1970, if it exceeds the higher of (i) the prevailing charge recognized by the carrier and found acceptable by the Secretary for similar services in the same locality in administering this part on December 31, 1970, or (ii) the prevailing charge level that, on the basis of statistical data and methodology acceptable to the Secretary, would cover 75 percent of the customary charges made for similar services in the same locality during the last preceding calendar year elapsing prior to the start of the twelve-month period (beginning July 1 of each year) in which the service is rendered....
 
 
 [3]
 Congress has extended until March 14, 1986, the freeze on the actual charges of nonparticipating physicians and on the "prevailing" and "customary" charge levels for Medicare reimbursement. Emergency Extension Act of 1985, Pub.L. No. 99-107, Sec. 5(b), 99 Stat. 479, amended by Pub.L. No. 99-155, Sec. 2(d), 99 Stat. 814 and Pub.L. No. 99-201, Sec. 2, 99 Stat. 1665. This extension of the fee freeze neither affects the temporary nature of Sec. 2306 nor changes our analysis of that section's constitutionality
 
 
 [4]
 Sec. 1395u(b)(4) provides:
 (4)(A) In determining the prevailing charge levels under the third and fourth sentences of paragraph (3) for physicians' services furnished during the 15-month period beginning July 1, 1984, the Secretary shall not set any level higher than the same level as was set for the 12-month period beginning July 1, 1983.
 (B) In determining the reasonable charge under paragraph (3) for physicians' services furnished during the 15-month period beginning July 1, 1984, the customary charges shall be the same customary charges as were recognized under this section for the 12-month period beginning July 1, 1983.
 (C) In determining the prevailing charge levels under the third and fourth sentences of paragraph (3) for physicians' services furnished during periods beginning after September 30, 1985, the Secretary shall treat the level as set under subparagraph (A) as having fully provided for the economic changes which would have been taken into account but for the limitations contained in subparagraph (A).
 (D) In determining the customary charges for physicians' services furnished during the 12-month period beginning October 1, 1985, or October 1, 1986, by a physician who at no time for any services furnished during the 12-month period beginning October 1, 1984, was a participating physician (as defined in subsection (h)(1) of this section), the Secretary shall not recognize increases in actual charges for services furnished during the 15-month period beginning on July 1, 1984, above the level of the physician's actual charges billed in the 3-month period ending on June 30, 1984.
 
 
 [5]
 Sec. 1395u(h) provides in relevant part:
 (1) Any physician or supplier may voluntarily enter into an agreement with the Secretary to become a participating physician or supplier. For purposes of this section, the term "participating physician or supplier" means a physician or supplier (excluding any provider of services) who, before October 1 of any year beginning with 1984, enters into an agreement with the Secretary which provides that such physician or supplier will accept payment under this part on the basis of an assignment described in subsection (b)(3)(B)(ii) of this section, in accordance with subsection (b)(6)(B) of this section, or under the procedure described in section 1395gg(f)(1) of this title for all items and services furnished to individuals enrolled under this part during the 12-month period beginning on October 1 of such year. In the case of a newly licensed physician or a physician who begins a practice in a new area, or in the case of a new supplier who begins a new business, or in such similar cases as the Secretary may specify, such physician or supplier may enter into such an agreement after October 1 of a year, for items and services furnished during the remainder of the 12-month period beginning on such October 1.
 
 
 [6]
 On appeal, appellee questions whether the district court had jurisdiction to hear this case because Congress has not provided for judicial review of the denial of Medicare Part B claims. See Heckler v. Ringer, 466 U.S. 602, ---- n. 4, 104 S.Ct. 2013, 2018 n. 4, 80 L.Ed.2d 622, 632 n. 4 (1984); United States v. Erika, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982). As appellee concedes, however, the broad jurisdictional bar recognized in Ringer does not preclude a party from raising a "substantial" constitutional challenge unrelated to any claim for benefits under Part B:
 [R]espondents seem to concede that to the extent that their claims are characterized as claims for Part B benefits, there is no judicial review for those claims under [Schweiker v. McClure, 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) and United States v. Erika, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982) ] ..... Respondents do argue, however, that to the extent that their claims can be characterized as collateral constitutional challenges, ... those constitutional challenges are properly before us. In light of our characterization of respondents' claims essentially as claims for benefits, ... and the fact that whatever constitutional claims respondents assert are clearly too insubstantial to support subject matter jurisdiction, ... we view this case as involving only respondents' Part A claims.
 Ringer, 466 U.S. at ---- n. 4, 104 S.Ct. at 2018 n. 4, 80 L.Ed.2d at 632 n. 4. Other courts have concluded that Ringer does not bar such claims. See Hatcher v. Heckler, 772 F.2d 427, 430-32 & n. 7 (8th Cir.1985) (concluding that constitutional challenges to the Medicare Act itself are not precluded by 42 U.S.C. Sec. 405(h) because such claims are "collateral to, and not 'inextricably intertwined with,' claims for entitlement"); Michigan Academy of Family Physicians v. Blue Cross & Blue Shield of Michigan, 757 F.2d 91, 93-94 (6th Cir.1985) (holding that Heckler v. Ringer does not bar constitutional and statutory challenge to regulation promulgated by Secretary for Health & Human Services when this challenge is unrelated to a claim for benefits), cert. granted sub nom. Heckler v. Michigan Academy of Family Physicians, --- U.S. ----, 106 S.Ct. 58, 88 L.Ed.2d 47 (1985); American Medical Ass'n v. Heckler, 606 F.Supp. 1422, 1432-33 (S.D.Ind.1985) (holding that Heckler v. Ringer does not prevent court from hearing equal protection challenge to fee freeze provision of Sec. 2306); Miller v. Heckler, 601 F.Supp. 1471, 1487-88 & n. 11 (E.D.Tex.1985) ("[C]onstitutional challenges are cognizable if they are aimed at the Medicare Act itself. Such claims arise solely under the Constitution, and therefore escape section 405(h)'s grasp."). Cf. Johnson v. Robison, 415 U.S. 361, 367, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974) (holding that veteran's suit is not barred by 38 U.S.C. Sec. 211(a) because "[a]ppellee's constitutional challenge is not to any such decision of the Administrator, but rather to a decison of Congress to create a statutory class entitled to benefits that does not include I-O conscientious objectors who performed alternative civilian service") (emphasis in original). Because appellants have raised a substantial challenge to the constitutionality of Sec. 2306, which does not involve a claim for benefits under Part B, we find that we have jurisdiction to hear this case.
 In addition, appellee contends that appellants' challenge to the temporary fee freeze may not be ripe for judicial resolution because they have not actually raised their rates. We reject this contention. To determine whether an issue is ripe for judicial review, a court must evaluate (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Because this appeal raises a facial attack on the constitutionality of Sec. 2306 and presents a purely legal question, we will never be in a better position to decide the issue. See, e.g., Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 81-82, 98 S.Ct. 2620, 2634-35, 57 L.Ed.2d 595 (1978); McCoy-Elkhorn Coal Corp. v. EPA, 622 F.2d 260, 264 (6th Cir.1980). Moreover, deferring resolution of the constitutionality of Sec. 2306 will force appellants to choose between complying with the temporary fee freeze and risking sanctions by raising their rates. It is well established that an issue is ripe for judicial review when the challenging party is placed in the dilemma of incurring the disadvantages of complying or risking penalties for noncompliance. See, e.g., Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1974); Epperson v. Arkansas, 393 U.S. 97, 100, 89 S.Ct. 266, 268, 21 L.Ed.2d 228 (1968). Hence, we conclude that the ripeness standard has been met in the instant case.
 
 
 [7]
 The temporary fee freeze provision simply reflects a general congressional concern that reductions in Medicare expenditures should not be borne solely by Medicare beneficiaries. See, e.g., 130 Cong.Rec.S. 8373, 8375 (daily ed. June 27, 1984) (Sen. Dole) (noting that physicians, hospitals, laboratories, health insurers, and employers will bear "[e]ighty-two percent of the health care program savings achieved in this bill"), reprinted in Legislative History at 2156
 
 
 [8]
 Appellants contend that one feature of Sec. 2306 will have a permanent effect. They argue that since the Secretary will not recognize any increases in the actual charges of non-participating physicians in calculating the "customary" charge in the future, Sec. 2306 will permanently affect their charges. We reject this contention. The statute will only affect what the Medicare program will pay in the future, and will have no effect on what non-participating physicians can actually charge to Medicare patients in the future. As appellants concede, Congress has the authority to determine what the Medicare program itself will pay physicians. Appellants' Brief at 19-20. In addition, appellants have offered no evidence concerning the future effects of this provision
 
 
 [9]
 In fact, the argument for the constitutionality of the provision challenged here is stronger because, unlike the Minnesota statute, Congress is only temporarily regulating the fees that may be charged to Medicare beneficiaries. Moreover, in Minnesota Ass'n of Health Care Facilities, the legislation fixed the rates charged to persons who were not receiving government medical benefits, whereas the instant regulation fixes the fees only with respect to persons receiving government medical assistance. Of course, we express no opinion concerning the constitutionality of the more far-reaching Minnesota legislation
 
 
 [10]
 Congress' extension of the freeze until March 15, 1986, see supra note 3, does not change the temporary nature of the legislation
 
 
 [11]
 We note that appellants have offered no evidence in this case that the actual charge permitted is unreasonable or arbitrary
 
 
 [12]
 Appellants argue that they have not voluntarily accepted government regulation of their charges to Medicare patients because they have not sought to "participate" in the Medicare program. This argument, however, is flawed. Appellants have continued to treat Medicare patients, and two of the appellants have admitted that they occasionally accepted assignments of Medicare reimbursement claims. Record on Appeal at 72. Moreover, the fact that Medicare patients comprise a substantial percentage of their practices does not render their participation "involuntary." See Bowles v. Willingham, 321 U.S. at 517, 64 S.Ct. at 648 (no taking where rent control statute did not require landlord to rent apartments); Minnesota Ass'n of Health Care Facilities, 742 F.2d at 446 ("MAHCF contends that business realities prevent nursing homes from leaving the Medicaid Program voluntarily. Despite the strong financial inducement to participate in Medicaid, a nursing home's decision to do so is nonetheless voluntary."). Under these circumstances, we hold that appellants' participation in the regulated industry is not involuntary
 
 
 [13]
 At one point, appellants apparently contend that Congress cannot regulate the amount that non-participating physicians charge their Medicare patients because there is no "privity" between the government and these doctors. See Appellants' Brief at 38-44 (citing, inter alia, Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1914); Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1907)). This argument is patently frivolous. The Supreme Court decisions upon which appellants rely have either been expressly overruled, see, e.g., Lincoln Federal Labor Union No. 19,129 v. Northwestern Iron & Metal Co., 335 U.S. 525, 533-37, 69 S.Ct. 251, 255-57, 93 L.Ed. 212 (1949) (expressly rejecting the Adair-Coppage interpretation of the Due Process Clause), or are clearly inapposite, see Greene, 360 U.S. at 508, 79 S.Ct. at 1419 (holding that "in the absence of explicit authorization from either the President or Congress, the respondents were not empowered to deprive petitioner of his job in a proceeding in which he was not afforded the safeguards of confrontation and cross-examination"); Schware, 353 U.S. at 239-47, 77 S.Ct. at 756-61 (petitioner's exclusion from the practice of law violated Due Process Clause because state could not reasonably find that he had not shown good moral character)
 
 
 [14]
 Historically, a bill of attainder was an Act of the English Parliament sentencing a specified individual or group of individuals to death, while a bill of pains and penalties was a law inflicting punishment other than death. See, e.g., United States v. Brown, 381 U.S. 437, 441, 85 S.Ct. 1707, 1711, 14 L.Ed.2d 484 (1965). Article I, Sec. 9 of the United States Constitution has been considered to prohibit bills of pains and penalties as well as bills of attainder. See, e.g., Nixon v. Administrator of General Services, 433 U.S. 425, 473-74, 97 S.Ct. 2777, 2805-06, 53 L.Ed.2d 867 (1977)
 
 
 [15]
 In England, bills of pains and penalties commonly imposed imprisonment, banishment and the punitive confiscation of property. See Nixon, 433 U.S. at 474, 97 S.Ct. at 2806. In this country, the punishments forbidden by the Bill of Attainder Clause have been expanded to include statutes barring participation by individuals or groups in specific professions. See, e.g., United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) (law barring Communist Party members from serving as officers in labor unions held to be bill of attainder); United States v. Lovett, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946) (holding that law cutting off salaries to three named government employees constituted bill of attainder); Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867) (law disqualifying priest from practicing as clergyman struck down as bill of attainder); Ex parte Garland, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867) (legislative bar excluding lawyers from practice of law violated Bill of Attainder Clause)
 
 
 [16]
 As the court below observed,
 It is common practice for the executive branch to be authorized to impose civil penalties in aid of its enforcement powers. In 1979, there were "some 348 statutory civil penalties enforced by 27 federal departments and independent agencies."
 Whitney, 603 F.Supp. at 828 (quoting Diver, The Assessment of and Mitigation of Civil Money Penalties by Federal Administrative Agencies, 79 Colum.L.Rev. 1435, 1438 (1979)).
 
 
 [17]
 The legislative history provides in part:
 The provision contains several administrative incentives ... to encourage physicians to voluntarily sign participation agreements. These include publication of directories, use of toll-free telephone lines to disseminate names of participating physicians and the use of direct lines for electronic receipt of claims. In addition, physicians have an incentive to become participating physicians because any normal increase in their actual charges during the 15-month period when medicare's reasonable charges are frozen, will be reflected in updating their future customary charge screen updates.
 Much of the success of the new "participating physician" program will depend on the involvement of the Medicare beneficiaries nationwide. In providing an increased amount of information to the beneficiary, the conferees hope they will take this opportunity to become increasingly informed about the practice patterns of the physicians in their communities.
 H.R.Conf.Rep. No. 98-861, at 1313-14, reprinted in Legislative History at 2001-02. Accord 130 Cong.Rec.S. 8373, 8375 (daily ed. June 27, 1984) (Sen. Dole), reprinted in Legislative History at 2157.
 
 
 [18]
 Although the Supreme Court has given a "broad and generous meaning" to the constitutional prohibition of bills of attainder, it has warned that this prohibition "was not intended to serve as a variant of the equal protection doctrine, invalidating every Act of Congress or the State that legislatively burdens some persons or groups but not all other plausible individuals. In short, while the Bill of Attainder Clause serves as an important 'bulwark against tyranny,' ... it does not do so by limiting Congress to the choice of legislating for the universe, or legislating only benefits, or not legislating at all." Nixon, 433 U.S. at 469-71, 97 S.Ct. at 2803-05 (footnotes omitted) (quoting Brown, 381 U.S. at 443, 85 S.Ct. at 1712). Since the expansion of constitutionally prohibited "punishment" to reach the civil penalty and incentive provisions here would have precisely this effect, we decline appellants' invitation to do so