**METROLINA FAMILY PRACTICE GROUP, P.A., et al., Plaintiffs,**

**v.**

**Louis M. SULLIVAN, M.D., Secretary, of Health and Human Services, and United States Department of Health and Human Services, Defendants.**

No. C–C–88–0436–M.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Dec. 29, 1989.

William L. Auten and Stanley Gertzman, Charlotte, N.C., for plaintiffs.

Sheila Lieber and Peter Kimm, Civ. Div., Washington, D.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McMILLAN, District Judge.

This suit (1) challenges the constitutionality of certain recent amendments to Title XVIII of the Social Security Act, Health Insurance for the Aged and Disabled, 42 U.S.C. § 1395 *et seq.*, and (2) requests declaratory and injunctive relief. Plaintiffs specifically attack §§ 1395*l* (h)(5)(C)–(D), 1395u(j), and 1395u(n) (which place ceilings on the amount physicians can charge Medicare patients), and §§ 1395u(b)(3)(B)(ii)(III), 1395u(*l* )(1)(A)(iv), and 1395u(m) (which place limitations on services for which physicians can charge Medicare patients).

The court heard plaintiffs' and defendants' motions for summary judgment on June 15, 1989.

On June 27, 1989, the court entered a memorandum of decision determining that defendants' motion for summary judgment should be granted and that plaintiffs' motion for summary judgment should be denied. Defendants were requested to draft and submit proposed findings of fact and conclusions of law. The court has reviewed the records and defendants' proposed findings and conclusions, and makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. No material facts are in dispute. Most of the relevant facts are set forth in a stipulation, filed May 30, 1989, signed by counsel for both parties. Other relevant facts are in the record and are uncontested.

2. Plaintiffs Metrolina Family Practice Group, P.A., Charlotte Medical Clinic, P.A., Mecklenburg Medical Group, P.A., Travis Medical Clinic, P.A., and Kouri Medical Clinic, P.A., are professional associations, organized and existing under the laws of the State of North Carolina; each has an office and principal place of business in Charlotte, North Carolina.

3. Plaintiff North Mecklenburg Family Practice Group, P.A. is a professional association, organized and existing under the laws of the State of North Carolina, with offices and its principal place of business in Huntersville, North Carolina.

4. Plaintiff The Durwood Medical Clinic, Inc. is a corporation, organized and existing under the laws of the State of North Carolina, with offices and its principal place of business in Charlotte, North Carolina.

5. Plaintiff Charlotte Internal Medicine Associates is a partnership, organized and existing under the laws of the State of North Carolina, with offices and its principal place of business in Charlotte, North Carolina.

6. Plaintiffs Thomas Dulin, Ralph V. Kidd and Harold P. Hope, Jr. are residents of Charlotte, North Carolina.

7. The individual plaintiffs, the corporate plaintiff's members or shareholders, and the partnership plaintiff's partners are "physicians" rendering "Physicians' services" under Part B of the Medicare program, 42 U.S.C. § 1395x(q) and (r).

8. Defendant Louis M. Sullivan, M.D. ("the Secretary"), is the Secretary of Health and Human Services and is responsible for the administration of programs within the Department of Health and Human Services ("HHS"), including the Medicare program.

9. Defendant United States Department of Health and Human Services is the agency empowered to implement and regulate the Medicare program and to enforce the provisions of the Social Security Act.

10. The Medicare program is divided into two parts. Part A provides insurance for hospital and related post-hospital services. 42 U.S.C. §§ 1395c *et seq.* Part B, at issue here, establishes a voluntary program of supplementary medical insurance covering physicians' and other medical services. 42 U.S.C. §§ 1395j *et seq.*

11. Under Part B, Medicare enrollees obtain health insurance benefits in return for the payment of monthly premiums, the amount of which is determined by the Secretary of HHS. 42 U.S.C. § 1395r(b)–(c); 42 U.S.C. § 1395t. These premiums, together with contributions from the federal government, make up the Federal Supple-

mentary Medicare Insurance Trust Fund ("Medicare Trust Fund"). For fiscal year 1988, premium payments accounted for approximately one-fourth of Medicare Trust Fund revenues. About three-fourths of these revenues were contributed by the federal government.

12. A physician who treats an enrollee under Part B may either bill the patient (who then requests reimbursement from Medicare) or submit the claim directly to Medicare. 42 U.S.C. § 1395u(b)(3)(B)(i) and (ii). In the latter group of cases (referred to as "assigned claims"), the physician collects from Medicare as assignee of the beneficiary, and bills the beneficiary for any applicable coinsurance and/or deductible amount. To help administer the program, the Secretary is authorized to enter into contracts with "carriers," usually large insurance companies, that process claims for reimbursement for physicians' services and maintain records of physician charges for specific localities. 42 U.S.C. § 1395u.

13. Physicians treating Medicare patients must decide each year whether to be a Medicare "participating" or "nonparticipating" physician. 42 U.S.C. § 1395u(h). A "participating" physician agrees to accept assignment of all of his or her Medicare patients' claims as full payment for all items or services furnished to Medicare beneficiaries during a twelve-month period. "Nonparticipating" physicians may continue to choose whether to accept assignment of claims on a case-by-case basis.

14. For both assigned and unassigned claims, Medicare will generally pay only the "reasonable charge" for the service involved, less any applicable co-payment. 42 U.S.C. § 1395*l*(a)(1)(B). The "reasonable charge" for a physician's services is based on billing information supplied by physicians, and is computed according to a formula set out by statute. 42 U.S.C. § 1395u(b)(3). Ordinarily, the "reasonable charge" for a service is defined as the lowest of (1) a physician's actual charge for the service; (2) the physician's "customary charge" for similar services as determined according to a fee profile developed by the local Medicare carrier; and (3) the "prevail-

ing charge recognized by the carrier" based on data for similar services in the locality. *Id.*

15. Under § 1395y of the Social Security Act, Medicare will not pay for services that are judged "not reasonable and necessary for the diagnosis or treatment of illness or injury." The statute establishes peer review organizations, composed of licensed physicians engaged in the practice of medicine within a geographic area, whose primary function is to determine whether services are reasonable and necessary. 42 U.S.C. § 1320c–3.

16. More than 32 million Americans are presently enrolled in Medicare, which has become one of the fastest growing federal programs. Federal outlays for Medicare amounted to nearly $88 billion in fiscal year 1988. Part B expenditures, which comprise about one-third of total Medicare spending, increased by approximately 17% per year between 1980 and 1988. Payments for physician services have accounted for approximately 72% of Part B expenditures. During the 1980's, as Medicare costs to the federal government soared, Congress became increasingly concerned about escalating charges to the Medicare program of physician services and the potential effect of these increases on the continuing integrity of the Medicare Trust Fund. In response, Congress has enacted numerous provisions affecting physician reimbursement under the Medicare program.

17. Plaintiffs challenge the statutory provisions described in the following paragraphs:

18. *Limitations on Non–Participating Physicians' Fees* (42 U.S.C. 1395u(j)). Prior to 1984, if a physician chose *not* to accept a particular assignment, Medicare placed *no limitation* on the amount that he or she could charge a Medicare beneficiary. In such cases Medicare would reimburse the patient for a physician's service based upon the "reasonable charge"; the beneficiary was then responsible for any difference between the "reasonable charge" and the physician's actual charge to the patient.

19. However, under amendments passed in the Deficit Reduction Act of 1984, Public L. No. 98–369 ("DEFRA–84") and the Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–509 ("OBRA–86"), if a "non-participating" physician decides not to accept a particular assignment, a limitation is nonetheless placed on the amount he or she can bill a Medicare patient. Section 1395u(j) states that for services performed from July 1, 1984 until December 31, 1987, physicians can be sanctioned if they knowingly and willfully bill their patients for more than their actual charges for the calendar quarter beginning on April 1, 1984. For services performed on or after January 1, 1987, physicians can be sanctioned for billing more than the "maximum allowable actual charge" ("MAAC") for any service. An individual physician's MAAC for a particular service is calculated by applying a mathematical formula to the physician's actual charges for that service between April 1 and June 30, 1984.

20. *Charges for Specified Surgical Procedures* (42 U.S.C. § 1395u(b)(10)). This provision mandates the application of a statutory formula to reduce the "prevailing charge" for both participating and non-participating physicians used in determining the Medicare "reasonable charge" for a number of specified surgical procedures listed in 42 U.S.C. § 1395u(b)(10)(B). The procedures include, for example, bronchoscopy, carpal tunnel repair, cataract surgery and coronary artery bypass surgery.

21. *Mandatory Assignment of All Clinical Diagnostic Laboratory Tests* (42 U.S.C. § 1395*l*(h)(5)(C)–(D)). The Secretary of HHS establishes fee schedules governing Medicare reimbursement for clinical diagnostic laboratory tests. Section 1395*l*(h)(5)(C) requires that when a clinical diagnostic laboratory test is performed by a laboratory independent of a physician's office or a rural health clinic, payment may only be made on the basis of assignment, with limited exceptions. Physicians or medical groups performing diagnostic laboratory tests must also assign all claims directly to Medicare. 42 U.S.C. § 1395*l* (h)(5)(D). If a person "knowingly and will-

fully and on a repeated basis" bills an individual for these charges, the Secretary may apply sanctions, including exclusion from the program and money penalties. *Id.*

22. *Physician Mark–Ups for Other Diagnostic Tests Performed by Outside Suppliers* (42 U.S.C. § 1395u(n)). If a physician's bill or request for payment does not expressly indicate that the billing physician (or another physician with whom his or her practice is shared) performed or supervised a diagnostic test (other than clinical diagnostic laboratory tests), then several restrictions apply. First, if the physician identifies an outside supplier and indicates how much the supplier charged the billing physician for the test, Medicare will only pay for the billing physician's actual acquisition costs. Second, if the physician does *not* supply this information, Medicare will not make any payment for the test. 42 U.S.C. § 1395u(n)(1). The statute further provides that a physician can not bill patients a mark-up over the actual acquisition costs plus applicable deductible or co-insurance amounts. Finally, billing physicians are prohibited from billing their Medicare patients for *any* amount if the bill is not payable by Medicare on account of failure to indicate who performed the test. 42 U.S.C. § 1395u(n)(2).

23. *Limitation Against Charging Patients For Services That Are Not "Reasonable and Necessary" for Assigned Claims* (42 U.S.C. § 1395u(b)(3)(B)(ii)(III)). Medicare payment may not be made for an assigned claim because it is not "reasonable and necessary." 42 U.S.C. 1395y. Under § 1395u(b)(3)(B)(ii), carriers administering the Medicare program must take action to assure that "the physician or other person furnishing [a medical] service agrees not to charge (or to refund amounts already collected) for such service."

24. *Limitation Against Charging Patients for Services That Are Not "Reasonable and Necessary" for Unassigned Claims* (42 U.S.C. § 1395u(*l*)(1)(A)(iv)). If nonparticipating physicians bill Medicare patients for services that are determined not to be "reasonable and necessary" un-

der § 1395y, any amount actually collected for these unassigned claims must be refunded to the patient. § 1395u(*l*)(1)(A)(iii) and (iv). This restriction does not apply in two situations: (1) if the physician "did not know and could not reasonably have been expected to know" that such determination of unreasonableness might be made, and (2) if the physician informed the patient before the service was provided that payment under Medicare Part B may not be made for the specific service and the individual had agreed to pay for that service anyway. Section 1395u(*l*)(1)(A)(iv) also requires nonparticipating physicians to refund any amounts collected from Medicare patients for a service, if Medicare payment is denied because it has been determined that the service "failed to meet professionally recognized standards of health care" under 42 U.S.C. § 1320c–3(a)(1)(B).

25. *Required Disclosures Regarding Elective Surgical Procedures by Nonparticipating Physicians* (42 U.S.C. § 1395u(m)). A nonparticipating physician who performs an elective surgical procedure on a patient enrolled in Medicare Part B for which the physician's actual charge is $500 or more and for which the physician does *not* accept assignment, must disclose the following information to the patient in writing: the physician's estimated actual charge for the procedure; the estimated approved charge under Part B for the procedure; the excess of the physician's actual charge over the approved charge; and the coinsurance amount applicable to the procedure. If a physician fails to make the required disclosures, he or she must refund to the patient any amounts collected in excess of the amount for which Medicare will reimburse the patient. If a physician "knowingly and willfully fails" to comply with these disclosure provisions, sanctions may be applied.

26. The parties have stipulated that certain of these statutory provisions described above have required plaintiffs to have charged their Medicare patients less than plaintiffs have charged their other patients for the same services. Plaintiffs have also been precluded from requesting their Medi-

care patients to pay plaintiffs the difference between the permitted Medicare beneficiary charges and the amount plaintiffs charge their other patients for the same services.

27. Plaintiffs assert that by regulating the amounts that they can charge their Medicare patients and the types of services for which they can charge, the challenged provisions encroach upon powers reserved to the states in violation of the Tenth Amendment. Complaint, ¶¶ 19–23. Plaintiffs further claim that these provisions "deprive plaintiffs and their Medicare patients of their freedom to contract, of the patients' rights to receive treatments they desire from physicians chosen by them, and of plaintiffs' rights to afford appropriate treatment to their Medicare patients," and that they constitute a "taking" of their property in violation of the Fifth Amendment. Complaint, ¶¶ 19–23. Plaintiffs also contend that the challenged provisions violate plaintiffs' and their Medicare patients' equal protection rights. *Id.* Finally, plaintiffs assert that these provisions violate their rights under the Fifth Amendment to substantive due process of law in that they are "arbitrary and discriminatory and bear no reasonable relation to the Congressional purposes of reducing the government's Medicare expenditures and of reducing the federal deficit." *Id.* at ¶ 25.

## CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1346.

### I. *Standing.*

2. In their complaint, plaintiffs have asserted alleged injuries to their patients, who are not parties to this suit. A general rule of standing is that "[o]rdinarily, one may not claim standing ... to vindicate the constitutional rights of some third party." *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1952); *see also Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 474, 102 S.Ct. 752, 759, 70 L.Ed.2d 700

(1982); *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). This rule is intended to avoid "adjudication of rights which those not before the Court may not wish to assert," and to assure "that the most effective advocate of the rights at issue is present to champion them." *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978).

3. Unique situations may arise where courts will make an exception to this rule. The relationship of the litigator to. the person whose rights are being asserted and the ability of the third party to assert his or her own rights are important considerations in determining whether a litigator will be allowed to assert the rights of third parties. *Singleton v. Wulff,* 428 U.S. 106, 115–16, 96 S.Ct. 2868, 2874–75, 49 L.Ed.2d 826 (1982). In special situations, doctors have been permitted to represent third-party patients. *See Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (doctors permitted to represent female patients to challenge state statutes excluding payment for certain categories of abortion under Medicaid); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (physician permitted to assert privacy interests of patients to challenge prohibition of sales of contraception).

■ 4. While plaintiffs have a professional and potentially confidential relationship with their patients, they can hardly be viewed as adequate representatives of their patients in this suit, where a major subject of contention is the fees that patients will be asked by their doctors to pay. The provisions challenged prevent physicians charging patients over and above the amount for which Medicare will reimburse them. If plaintiffs succeed in this suit, their patients will literally pay. Third party patients are therefore likely to be diametrically opposed to the interests asserted by treating physicians. Accordingly, plaintiffs do not have standing to assert the rights of their Medicare patients. Plaintiffs' independent standing to challenge each of the statutory provisions based on their own injury, however, is not affected.

■ 5. Defendants have argued that the plaintiffs lack standing to assert their Tenth Amendment claims based on the theory that only states, and not private parties, can challenge congressional legislation under the Tenth Amendment. The court has previously concluded that although the Tenth Amendment "directly regulate[s] relations between governments rather than the relationship between governments and individuals, nevertheless, individuals should have standing to assert constitutional protections derived under [it]." *Gilliard v. Kirk,* 633 F.Supp. 1529, 1949 (W.D.N.C.1986), *rev'd on other grounds sub nom. Bowen v. Gilliard,* 483 U.S. 587, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987) (permitting plaintiffs to draw on the Tenth Amendment to support challenge to AFDC regulations). *See also Atlanta Gas Light Co. v. United States Dep't of Energy,* 666 F.2d 1359, 1369 n. 16 (11th Cir.), *cert. denied* 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 78 (granting private party standing under the Tenth Amendment to challenge federal legislation). The plaintiffs are permitted to assert that the Medicare provisions infringe upon state sovereignty under the Tenth Amendment.

II. *The Medicare Provisions Challenged Do Not Encroach Upon the Powers Reserved to the States in Violation of the Tenth Amendment.*

■ 6. The Tenth Amendment "expressly declares the Constitutional policy that Congress may not exercise power in a fashion that impairs the states' integrity or their ability to function effectively in the federal system." *Fry v. United States,* 421 U.S. 542, 547 n. 7, 95 S.Ct. 1792, 1795–96 n. 7, 44 L.Ed.2d 363 (1974). Plaintiffs' sole argument with regard to their Tenth Amendment claim is that the regulations challenged infringe on state sovereignty because only the states may exercise direct control over the practice of medicine. Complaint, at 2. In support of this proposition, plaintiffs point to *Linder v. U.S.,* 268

U.S. 5, 45 S.Ct. 446, 69 L.Ed. 819 (1925), in which the Supreme Court held that "direct control of medical practice in the states is beyond the power of the federal government." *Id.* at 18, 45 S.Ct. at 449. However, *Linder* further held that Congress *may* "regulate medical practice in the States ... as far as reasonably appropriate for or merely incidental to" enforcement of other measures which Congress has the Constitutional authority to enact. 268 U.S. at 18, 45 S.Ct. at 449.

7. The provisions that the plaintiffs challenge comprise a small part of federal legislation designed to establish a national health insurance program for the elderly and disabled. In determining the scope of medical benefits to be provided, Congress decided to include limitations on the types of services and the amount of fees for which the federal government will pay. Congress also decided to prohibit physicians who choose to treat Medicare patients from charging patients for fees and services for which Medicare will not pay. Whatever restrictions Congress placed on physicians are incidental to this national health insurance program, and do not directly regulate the medical profession. Significantly, the restrictions apply only to physicians who *choose to participate* in the federal Medicare program. Physicians are free to provide services to private patients and collect whatever fees they wish. The court also notes that the amounts payable under Medicare's "reasonable charge" standards, as well as the types of services judged to be "reasonable and necessary," are evaluated by peer organizations of local physicians.

8. The challenged provisions do not amount to direct control of medical practice reserved to the states.

▇ 9. Even if these Medicare regulations should be viewed as directly controlling a small area of medical practice, they nonetheless constitute a valid exercise of Congress' power under the Spending Clause. Article I § 8 cl. 1 of the Constitution grants Congress the power to spend money in aid of the "general welfare." Congress has broad discretion in determining what is for the general welfare, and the Tenth Amendment will not act as a bar to legislation that is "plainly national in area and dimensions." *Helvering v. Davis,* 301 U.S. 619, 641, 644, 57 S.Ct. 904, 909–10, 81 L.Ed. 1307 (1936) (upholding Federal Old Age Benefits scheme of the Social Security Act against Tenth Amendment challenge); *see also Isaacs v. United States,* Civ. 87–64 PHX RGS, slip op., 1987 WL 108962 (October 14, 1987 D.C.Ariz.). The mere fact that an activity has been considered to be a "local interest" in the past does not invalidate Congressional legislation: "Needs that were narrow or parochial a century ago may be interwoven in our day with the well-being of the Nation." 301 U.S. at 641, 57 S.Ct. at 908–09. The problem of limiting physicians' fees in the federal health insurance program is indisputably of national concern. *Isaacs v. United States.*

10. The challenged regulations do not violate the Tenth Amendment.

III. *The Medical Provisions Challenged Do Not Violate the Fifth Amendment.*

▇ 11. Plaintiffs argue that the Medicare provisions at issue impede their liberty to contract and to practice medicine freely in violation of their substantive due process rights under the Fifth Amendment. Legislation regulating economic or social matters will satisfy the due process requirement if it is "seen to have a reasonable relationship to a proper legislative purpose, and [is] neither arbitrary nor discriminatory." *Nebbia v. New York,* 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934).

12. Plaintiffs do not disagree that the government's objective of lowering the federal budget deficit is a valid purpose. Rather, they contend that prohibiting *patients* from paying fees in excess of what Medicare is willing to pay has no effect on what the federal government spends. Plaintiffs' memorandum in support of their motion for summary judgment, at 7. However, Congress' purpose in passing the provisions challenged was not just to save federal money, but also to protect elderly

beneficiaries from paying unreasonable fees or paying for unnecessary services. All of the provisions challenged are directly related to these legitimate ends and are neither arbitrary nor discriminatory. *See also Whitney v. Heckler*, 780 F.2d 963 (11th Cir.), *cert. denied sub nom. Whitney v. Bowen*, 479 U.S. 813, 107 S.Ct. 65, 93 L.Ed.2d 23 (1986); *Isaacs v. United States.*

13. The plaintiffs also assert that the regulations violate the equal protection clause of the Fifth Amendment because they classify physicians according to whether they treat Medicare patients. Unless provisions challenged under the equal protection clause infringe upon a fundamental liberty interest or contain a suspect classification, the courts "presume the constitutionality of the statutory discrimination and require only that the classification challenged be rationally related to a legitimate [government] interest." *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).

14. The government's different treatment of physicians participating in Medicare is rationally related to the goals of the old age and disability health insurance program. *See Isaacs v. United States; American Medical Association v. Heckler*, 606 F.Supp 1422, 1437 (N.D.Ill.1985).

15. Plaintiffs' contention that the regulations constitute an unconstitutional taking is also without merit. "It is well established that government price regulation does not constitute a taking of property where the regulated group is not required to participate in the regulated industry." *Whitney v. Heckler*, 780 F.2d at 972. *See also Isaacs v. United States* (ceiling on fees physicians can charge their Medicare patients under 42 U.S.C. § 1396u(j) is not a taking); *American Medical Association v. Bowen*, 659 F.Supp. 1143, 1150 (N.D.Tex.1987) ("MAAC" restriction for nonparticipating physicians in Medicare Part B is not a taking); *Bowles v. Willingham*, 321 U.S. 503, 517–18, 64 S.Ct. 641, 648–49, 88 L.Ed. 892 (1944) (rent control is not a taking because landlord is not required to offer apartment for rent). Plaintiffs are not required to participate in Medicare Part B, and are not deprived of any income or property by restrictions on what they can charge their. patients.

16. The challenged Medicare regulations do not violate the Fifth Amendment.

## CONCLUSIONS

Based on the foregoing, the court concludes that plaintiffs' motion for summary judgment should be denied and that defendants' motion for summary judgment should be granted.