Douglass G. WHITNEY, M.D., et al., Plaintiffs,

v.

Margaret HECKLER, Secretary of the Department of Health and Human Services, Defendant.

Civ. A. No. C84–1926.

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 4, 1985.

Kent Masterson Brown, Greenebaum, Young, Trei, Lexington, Ky., Henry Angel, Savell, Williams, Cox & Angel, Atlanta, Ga., for plaintiffs.

Dina Lassow, Dept. of Justice, Civil Div., Washington, D.C., Larry Thompson, U.S. Atty., Atlanta, Ga., for defendant.

## ORDER

ROBERT H. HALL, District Judge.

This case came to be heard on the merits on November 2, 1984. The parties have stipulated to the relevant facts. The court hereby makes this order, incorporating the agreed-upon facts and setting out the court's conclusions of law.

## I. FACTUAL BACKGROUND

1. The three plaintiffs in this case, Douglass G. Whitney, M.D., W.D. Jordan, M.D., and Fred Shessel, M.D., are duly licensed and practicing private physicians in the Atlanta, Georgia area, who challenge the constitutionality of certain provisions of the Deficit Reduction Act of 1984, P.L. 98–369, which affect the Medicare Program.

2. The Medicare Program was enacted in 1965 as Subchapter XVIII of the Social Security Act. This program is divided into two parts. Part A provides reimbursement for covered hospital and related post-hospital services. 42 U.S.C. §§ 1395c; 1395d. Persons who are eligible for Medicare may elect to enroll in Part B, which establishes a program of supplementary medical insurance providing reimbursement for covered physicians' and other related medical services. 42 U.S.C. §§ 1395k, 1395l, 1395x(s). This case involves Part B exclusively.

3. Under Part B, Medicare enrollees obtain benefits in return for the payment of monthly premiums, the amount of which is determined by the Secretary of Health and Human Services (the "Secretary"). 42 U.S.C. § 1395r(b)–(c). These premiums and contributions from the Federal Government make up the Federal Supplementary Medical Insurance Trust Fund, out of which payment is made for the benefits provided under Part B. 42 U.S.C. § 1395t.

4. Medicare Part B payments are made on a "reasonable charge" basis. This "reasonable charge" is computed according to a formula set out by statute. Under 42 U.S.C. § 1395u(b)(3), a physician's (1) actual billed charge for each service is compared with (2) what he or she customarily charges for that service—the "customary" charge—and with (3) the charge made for similar services by most physicians in the billing physician's locality—the "prevailing" charge. (The "prevailing" charge is the "level that, on the basis of statistical data ..., would cover 75 percent of the customary charges made for similar services in the same locality...." 42 U.S.C. § 1395u(b)(3).) The Medicare program then recognizes the lowest of these three as the "reasonable charge."

5. Prior to the enactment of the Deficit Reduction Act, payment for physicians' services was made in one of two ways. The beneficiary could pay the physician directly and then request reimbursement of the "reasonable charge" from Medicare. 42 U.S.C. § 1395u(b)(3)(B)(i). Alternatively, the beneficiary could, if the physician were willing, assign to the physician the beneficiary's right to reimbursement. 42 U.S.C. § 1395u(b)(3)(B)(ii). The physician could then collect payment from Medicare as assignee of the beneficiary. As assignment did not affect the amount that Medicare paid for the physician's services, but did preclude the physician from charging the

beneficiary more than the 20 percent coinsurance on Medicare payments.

6. Prior to the enactment of the Deficit Reduction Act, Medicare's "customary" and "prevailing" charge data were updated on July 1 of each year based on the prior year's data. Physicians were permitted to accept or not accept assignment on a claim-by-claim basis, and if a physician chose not to accept assignment, Medicare placed no limitation on the amount that he or she could charge a Medicare beneficiary. Patients of physicians not accepting assignment received Medicare reimbursement only to the extent of the physician's "reasonable charge." The beneficiary was responsible for the difference between the physician's actual charge and 80 percent of Medicare's "reasonable charge."

7. Section 2306 of the Deficit Reduction Act, which was signed by President Reagan on July 18, 1984, makes several changes that affect physician reimbursement. First, § 2306(a) modifies 42 U.S.C. § 1395u(b) by adding a new subsection (4). The new provision freezes both Medicare's "prevailing" and "customary" charge levels for "the 15-month period beginning July 1, 1984" at levels no higher than the levels that were set for "the 12-month period beginning July 1, 1983."

8. Second, § 2306(c) of the Deficit Reduction Act amends 42 U.S.C. § 1395u by adding a new subsection (h). Subsection (h) requires physicians to decide before October 1 of each year whether they will be "participating" or "non-participating physicians." A "participating physician" enters into an agreement with the Secretary to accept payment on an assignment basis for all items or services furnished to Medicare beneficiaries during the 12-month period beginning October 1. A "participating physician" may not charge any Medicare patient on any basis other than on an assignment basis during the 12-month period covered by the agreement. "Non-participating physicians," those who do not enter into an agreement with the Secretary to accept payment on an assignment basis for all items or services furnished to Medicare

beneficiaries, may continue to ·accept assignment on a claim-by-claim basis.

9. Third, § 2306(c) of the Deficit Reduction Act adds a new subsection (j) to 42 U.S.C. § 1395u which freezes the actual amount "non-participating physicians" may charge Medicare patients for the fifteen month period which began on July 1, 1984. Subsection (j) requires the Secretary to monitor each "non-participating physician's" actual charges to beneficiaries for services rendered during that period. If a "non-participating physician" "knowingly and willfully bills ... [beneficiaries] ... for actual charges in excess of such physician's actual charges for the calendar quarter beginning on April 1, 1984," the physician may be sanctioned by the Secretary. The Secretary may bar said physician from participation in the Medicare program for up to five years, or may impose a civil penalty of up to $2,000 per violation. 42 U.S.C. § 1395u(j)(1) and (2).

10. Finally, § 2306 of the Deficit Reduction Act directs that the Secretary publish a directory of "participating physicians" to be made available to Medicare beneficiaries; maintain toll-free telephone numbers at which beneficiaries may obtain the names, addresses, telephone numbers and specialties of "participating physicians"; publish a list containing the name, address, specialty and percent of claims submitted with respect to each physician paid on an assignment basis; and provide for the electronic receipt by carriers of claims from "participating physicians," thereby enabling those physicians to have their claims processed more quickly. 42 U.S.C. §§ 1395u(h)(2)–(3) and 1395u(i). Congress also created a new subsection (4)(D) to 42 U.S.C. § 1395u(b), which specifies that in determining the customary charges of "non-participating physicians" for the 12-month periods beginning October 1, 1985 and October 1, 1986, the Secretary shall not "recognize increases in actual charges for services furnished" during the 15-month freeze period. The Secretary shall, on the other hand, recognize increases in the actual charges of "participating physicians"

during that period. Although their reimbursement is limited by the customary and prevailing charge freeze while the freeze is in effect, "participating physicians'" increased actual charges during the freeze will form the data base for computing their "customary" charge levels once the freeze is lifted.

11. In their Verified Complaint for Injunctive Relief and Declaration of Rights, as amended, plaintiffs allege, *inter alia,* that they did not elect to become "participating physicians" under the Deficit Reduction Act prior to October 1, 1984; that they plan to raise their fees to their patients enrolled under Medicare Part B within the 15-month period beginning July 1, 1984; that 50 to 60 percent of their patients are Medicare Part B enrollees; that 85 percent of these patients have supplemental health insurance; and that the Deficit Reduction Act of 1984 as applied to them violates the Fifth Amendment to and Article I, Section 9 of the United States Constitution.

12. The defendant, the Secretary of the Department of Health and Human Services, maintains that § 2306 of the Deficit Reduction Act is a constitutional exercise of Congress' authority which comports fully with the due process guaranteed by the Fifth Amendment and does not violate Article I, Section 9 of the Constitution. She has filed a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the plaintiffs' complaint for failure to state a claim upon which relief can be granted.[1]

13. This Court, after considering the plaintiffs' pleadings and hearing argument from both sides, denied plaintiffs' motion for a temporary restraining order on September 26, 1984. By Stipulation and Order dated October 15, 1984, the parties agreed to present this case on the merits, without presenting live testimony, as to whether the questioned portions of the Deficit Reduction Act of 1984 are unconstitutional and should be permanently enjoined. On November 2, 1984, this court heard oral arguments on the merits by counsel for each party.

## II. CONCLUSIONS OF LAW

1. In 1984, Congress was faced with skyrocketing costs in the Medicare Program, which, along with numerous other factors, were contributing to the rapidly increasing federal deficit. Accordingly, along with many other measures in the Deficit Reduction Act, it curtailed the increase in certain federal outlays by freezing the customary and prevailing charges recognized by Medicare for physicians' services for the 15-month period running from July 1, 1984 to September 30, 1985. However, Congress did not want the burden of the freeze to be borne by the elderly beneficiaries of the Medicare Program. As stated by Senator Dole, Chairman of the Senate Committee on Finance:

> Under section 2306, $2.5 billion will be saved by freezing for 15 months the customary and prevailing charge levels used to determine what medicare will pay for physician services. Needless to say, there has been a great deal of concern about how physicians can be prevented from shifting the burden of such a freeze to beneficiaries. *Simply freezing what we pay for physician services provides little protection to program beneficiaries.* If a physician does not elect to take assignment, beneficiaries can be held responsible for the full difference between what the program pays and what the physician charges.
>
> Mr. President, the conferees spent a great deal of time in discussions with the administration trying to address this concern. As a result, the conferees agreed to a provision which works in concert with organized medicine's voluntary freeze.

130 Cong.Rec.S. 8373, 8375 (daily ed. June 27, 1984) (emphasis added), reprinted in 1984 U.S.Code Cong. & Admin.News, Deficit Reduction Act Legislative History at 2156 (hereinafter "Legislative History"). Similarly, Congressman Rostenkowski,

---

1. Because the parties stipulated that the court should decide the case on the merits, rather than on a procedural motion, the court DENIES defendant's motion to dismiss.

Chairman of the House Committee on Ways and Means, stressed that the measure included "protection for beneficiaries."

There is a 15-month freeze on medicare-recognized physician fee increases, with protection for beneficiaries. Under this provision, doctors who become medicare "participating physicians" would accept the medicare fee allowance as payment in full. Other physicians would be prohibited from raising their medicare fees. Thus, *beneficiaries would have full protection against the possibility that they rather than the physicians, might bear the effect of the fee freeze.* The fee freeze provisions are intended to work in concert with the efforts—which are to be commended—of the American Medical Association and many individual medical societies which have urged their members voluntarily to freeze their fees. 130 Cong.Rec.H. 7085, 7086 (daily ed., June 27, 1984) reprinted in Legislative History at 2144 (emphasis added). *Accord,* H.Conf. Rep. No. 98–861, reprinted in Legislative History at 2001.

2. The temporary freeze on the fees non-participating physicians may charge their Medicare patients is an integral, reasonable part of Congress' exercise of its undisputed authority to control federal spending. Congress did not want the burden of its fiscal measure to be shifted to the elderly Medicare beneficiaries.

3. Plaintiffs contend that the contested portions of § 2306 deprive them of their liberty in violation of the Fifth Amendment to the United States Constitution. However, the substantive due process cases on which they rely, such as *Adair v. United States,* 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908) and *Coppage v. Kansas,* 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915), have long been "sapped ... of their authority." *Phelps Dodge Corp. v. National Labor Relations Board,* 313 U.S. 177, 187, 61 S.Ct. 845, 849, 85 L.Ed. 1271 (1941). The authorities cited by plaintiff belong to an

overruled "vintage of decisions which exalted substantive due process by striking down state [and federal] legislation which a majority of the Court deemed unwise." *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 164, 94 S.Ct. 407, 412, 38 L.Ed.2d 379 (1973).

4. Plaintiffs' denial of liberty argument is readily disposed of under the law of substantive due process which now governs. This case is similar to the recent case of *Minnesota Association of Health Care Facilities v. Minnesota Department of Public Welfare,* 742 F.2d 442 (8th Cir. 1984), which upheld the constitutionality of a Minnesota statute limiting the rates nursing homes which participate in the Medicaid Program may charge residents who do not receive Medicaid benefits.[2] The Minnesota Association of Health Care Facilities contended that regulation of the fees they could receive from private sources denied them their constitutional right to due process of law. The Eighth Circuit found that the Minnesota statute satisfied substantive due process requirements:

"If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio." Nebbia v. New York, supra* 291 U.S. [502] at 537 [54 S.Ct. 505 at 516, 78 L.Ed. 940 (1934) ]; *see North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 164–67 [94 S.Ct. 407, 412–14, 38 L.Ed.2d 379] (1973); *Ferguson v. Skrupa,* 372 U.S. 726, 728–32 [83 S.Ct. 1028, 1030–32, 10 L.Ed.2d 93] (1963); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 488 [75 S.Ct. 461, 464, 99 L.Ed. 563] (1955). The Minnesota legislature could reasonably find that differences in rates for the same nursing home services, depending wholly upon whether or not a resident

---

2. The Medicaid Program was created in 1965 as Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* It authorizes grants to the states to help fund medical assistance programs for the needy.

receives medical assistance, are inimical to the public welfare, and thus it could properly choose to regulate the rates that nursing homes participating in Medicaid charge to residents who do not receive medical assistance. The statute enacted to achieve this purpose has a rational relationship to the end sought and is not arbitrary or impermissibly discriminatory.

742 F.2d at 447.

5. The finding of *Minnesota Association* is equally applicable here.[3] Congress has reasonably found that limiting the increase in Medicare payments without also limiting the total fees which may be charged to Medicare beneficiaries would be harmful to the public welfare. Section 2306 is constitutional because it is a reasonable means of reducing the federal budget without burdening Medicare beneficiaries. It is neither arbitrary nor impermissibly discriminatory. Non-participating physicians are the only ones who will be treating Medicare beneficiaries on a non-assigned basis, so it is only necessary to limit and monitor their fees to achieve Congress' intent. Lists of participating physicians will be created not to harm non-participating physicians, but to provide important information to Medicare beneficiaries seeking to minimize their medical expenditures.

6. In its decision, the Eighth Circuit relied on *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), the case which marks the demise of the use of the substantive due process doctrine to invalidate state and federal regulations in the economic sphere. In *Nebbia*, the Supreme Court held that it was constitutional for a state to fix the selling price of milk. "[N]either property rights nor contract rights are absolute ... Equally fundamental with the private right is that of the public to regulate it in the common interest." *Id.* at 523, 54 S.Ct. at 510 (footnotes omitted). The Court went on to state:

The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.

*Id.* at 525, 54 S.Ct. at 510 (footnotes omitted).

7. Here, Congress reasonably found that a freeze on federal Medicare payments would harm Medicare beneficiaries unless it also acted to place a cap upon the total fees which could be charged to these beneficiaries by their physicians. Congress also reasonably determined that the interests of Medicare patients would be served if more physicians limited their fees and took cases on an assigned basis. Therefore, it established incentives for physicians to "participate," and agree to take all cases on an assigned basis for a one-year period. These aspects of § 2306 are reasonable in relation to the Medicare program, and were adopted in the interests of the community. Therefore, due process has been satisfied.

8. Plaintiffs next claim that the freeze on their fees and the alleged encouragement to Medicare beneficiaries to use participating physicians constitutes a *taking* of their property without due process of law in violation of the Fifth Amendment. However: "It has long been recognized that the Fifth Amendment prohibitions [sic] against the taking of property for public use without just compensation or due process of law refers only to direct appropriation and not to consequential injuries resulting from the exercise of lawful regulations." *Condor Operating Co. v. Sawhill*, 514 F.2d 351, 361 (Temp.Emer.Ct.App.), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975), citing *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88

---

3. If anything, the case at hand is stronger, since Congress is regulating only the fees which may be charged to Medicare beneficiaries. Moreover, this regulation is only a temporary one.

L.Ed. 892 (1944). Moreover, price controls are "one of the means available ... to the Congress ... for the protection and promotion of the welfare of the economy." *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 394, 60 S.Ct. 907, 913, 84 L.Ed. 1263 (1940). Since § 2306 is a lawful exercise of Congress' power, any consequential injuries to plaintiffs do not constitute a "taking."

9. The nursing homes who were plaintiffs in *Minnesota Association, supra,* also argued that their property was being taken without just compensation, relying, like plaintiffs here, on *Bluefield Water Works & Improvement Co. v. Public Service Commission,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). The Eighth Circuit found public utilities cases "inapposite, however, because the present case simply does not involve a forced taking of property by the state." *Minnesota Association,* 742 F.2d at 446. The nursing homes had argued that "business realities" prevented them "from leaving the Medicaid program voluntarily." The court held that "[d]espite the strong financial inducement to participate in Medicaid, a nursing home's decision to do so is nonetheless voluntary." *Id.* The Eighth Circuit went on to state: "This voluntariness forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation, and thus it is unnecessary in this case to employ the adequacy standards applicable to state regulation of public utility rates." *Id.*

10. This holding also applies to the case at hand. While plaintiffs seek to distinguish *Minnesota Association* on the ground that they have not voluntarily agreed to accept regulation because they have chosen not to "participate" in the Medicare Program, plaintiffs have the further option of not treating Medicare patients at all and thus being able to raise fees to all their patients without penalty. While they, like the nursing homes, may have a "strong financial inducement" to serve Medicare beneficiaries, their decision to do so is nonetheless voluntary. Thus,

§ 2306 cannot be found to have effected an unconstitutional taking of property.

11. Plaintiffs' final argument is that the challenged portions of § 2306 of the Deficit Reduction Act are a bill of attainder which is proscribed by Article I, Section 9 of the United States Constitution. They contend that § 2306 inflicts punishment on non-participating physicians without a judicial trial. The alleged punishment has two aspects: (1) subjecting non-participating physicians to civil money assessments and barring them from participating in the Medicare Program for a prescribed period if they raise their fees to Medicare beneficiaries while the 15 month freeze is in effect; and (2) depriving these physicians of the right to be listed in the directories of participating physicians mandated by the Act. However, the burdens which plaintiffs perceive to flow from Congress' efforts to reduce the federal deficit while at the same time protecting Medicare beneficiaries simply do not constitute a bill of attainder.

12. Historically, a bill of attainder was an Act of the English Parliament sentencing a specified individual or group of individuals to death. Article I, Section 9 of the United States Constitution is also considered to prohibit "bills of pains and penalties," i.e. legislative Acts inflicting punishment other than death. *See Nixon v. Administrator of General Services,* 433 U.S. 425, 473–74, 97 S.Ct. 2777, 2805–06, 53 L.Ed.2d 867 (1977). While Supreme Court cases have given a "broad and generous meaning to the constitutional protection against bills of attainder," *Id.* at 469, 97 S.Ct. at 2803, plaintiffs here seek an impermissibly broad interpretation.

13. A bill of attainder is defined as a law which legislatively determines guilt and imposes punishment upon a designated person or class of persons without benefit of judicial trial. *Nixon v. Administrator of General Services, supra; United States v. Brown,* 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965); *Cummings v. Missouri,* 71 U.S. 277 (4 Wall. 277), 18 L.Ed. 356 (1866). In determining whether § 2306 is a bill of attainder "[t]he judicial function is

'not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations....'" *Selective Service System v. Minnesota Public Interest Research Group,* — U.S. —, 104 S.Ct. 3348, 3355, 82 L.Ed.2d 632 (1984), quoting *CSC v. Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

14. Section 2306 cannot reasonably be construed as a legislative determination of guilt and imposition of punishment. As described above, this provision of the Deficit Reduction Act freezes the reasonable charges which will be paid by Medicare for physicians' services for a 15-month period. To avoid the shifting of the burden of the freeze to elderly Medicare beneficiaries, Congress also froze the actual charges which physicians taking cases on a non-assigned basis may bill their patients. To enforce the latter aspect of the freeze, the Secretary is directed to monitor non-participating physicians' actual charges, and is authorized to impose civil sanctions on physicians who knowingly and willfully raise their charges to Medicare enrollees. Thus, non-participating physicians are not legislatively determined to be guilty of an offense. Furthermore, Congress has not deprived plaintiffs of any right to participate in what they call a referral program. The plaintiffs have voluntarily chosen not to be participants.

15. Congress has properly exercised its authority to temporarily freeze the fees of non-participating physicians, and has given the executive branch the authority to enforce the legislation. It is common practice for the executive branch to be authorized to impose civil penalties in aid of its enforcement powers. In 1979, there were "some 348 statutory civil penalties enforced by 27 federal departments and independent agencies." Diver, *The Assessment and Mitigation of Civil Money Penalties by Federal Administrative Agencies,* 79 Colum.L.Rev. 1435, 1438 (1979).

16. In addition, plaintiffs cannot satisfy the following three inquiries established by the Supreme Court for determining "whether a statute inflicts forbidden punishment":

(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish." *Nixon, supra,* 433 U.S. at 473, 475–76, 478 [97 S.Ct. at 2805, 2806–07, 2808]....

*Selective Service System, supra,* 104 S.Ct. at 3355–56.

17. In *Selective Service System,* the Supreme Court upheld the constitutionality of § 1113 of the Department of Defense Authorization Act of 1983 ("§ 1113"), which denies federal financial assistance under Title IV of the Higher Education Act of 1965 to male students who fail to register for the draft. The Court found that under these criteria § 1113 was not a bill of attainder. With regard to the first question, the Court found that the denial of a non-contractual benefit did not approach " 'the infamous punishment of imprisonment' or other disabilities historically associated with punishment." *Id.* at 3356. Moreover, the denial of benefits was not even permanent, since the students could become eligible for Title IV aid "simply by registering late." *Id.*

18. Here too, the alleged punishments do not fall within the "historical meaning of legislative punishment." In addition, plaintiffs may avoid punishment by not raising their fees. They may also remove themselves from the class allegedly being punished by becoming participants. While they did not meet the deadline of October 1, 1984 for the current year, they may become participants for any subsequent year.

19. With regard to the second and third inquiries, the Supreme Court found that § 1113 furthered the nonpunitive goals of encouraging young men to register for the draft, and furthered a "fair allocation of scarce federal resources...." *Id.* at 3357. Section 2306 is also designed to further non-punitive goals. The freeze was not designed to punish non-participating physi-

cians, but to protect Medicare beneficiaries. The publication of a directory of participating physicians was intended to encourage participation, and enable beneficiaries to avail themselves of the services of physicians who will not charge them more than the "reasonable" rate recognized by Medicare.

20. Plaintiffs recognize Congress' unambiguous statement of intent, but seek to read other motives into the statute. However, this court must look only at the language of § 2306 and the reasons Congress gave for its enactment in determining whether the section is valid: "In judging the constitutionality of the Act, we may only look to its terms, to the intent expressed by Members of Congress who voted its passage, and to the existence or nonexistence of legitimate explanations for its apparent effect." *Nixon, supra,* 433 U.S. at 484, 97 S.Ct. at 2811. The terms of § 2306, the consistent, explicit statements of legislative intent, and the existence of legitimate explanations for the statute, make it clear that § 2306 is not a punitive bill of attainder.

21. Congress has properly exercised its constitutional authority in enacting § 2306(c) of the Deficit Reduction Act of 1984, and judgment is hereby entered for defendant.