608 A.2d 633

**PENNSYLVANIA MEDICAL SOCIETY, Petitioner,**

**v.**

**Constance B. FOSTER, Insurance Commissioner of the Commonwealth of Pennsylvania; the Insurance Department; and Ernest D. Preate, Jr., Attorney General of the Commonwealth of Pennsylvania, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 1991.

Decided April 29, 1992.

Reconsideration Denied May 29, 1992.

530

Robert B. Hoffman, for petitioner.

Gregory P. Miller, for respondents.

Before CRAIG, President Judge, DOYLE, COLINS, PALLADINO, McGINLEY, SMITH and PELLEGRINI, JJ.

PALLADINO, Judge.

In our original jurisdiction under Pa.R.C.P. No. 1035, Petitioner Pennsylvania Medical Society (Society) has filed a motion for summary judgment based on its interpretations of the newly enacted physician billing and reimbursement provisions of the Motor Vehicle Financial Responsibility Law (Law), 75 Pa.C.S. §§ 1701–1799.7. For the following reasons, we deny summary judgment.

## I. PROCEDURAL HISTORY

On March 27, 1990, the Society filed a petition for review in the commonwealth court's original jurisdiction. The petition concerned the implementation of section 18 of the Act of February 7, 1990, P.L. 11, Act No. 90–6 ("Act 6") which amended section 1797 of the Law governing the amount and the manner in which a medical services provider can collect fees for the treatment of automobile accident victims. On March 30, 1990, the Society amended its petition for review to include a request for an injunction and five counts averring grounds for a declaratory judgment.

On April 19, 1990, Respondent Attorney General Ernest D. Preate, Jr. (Attorney General) filed preliminary objections to the Society's amended petition and alleged that he was not a necessary party. On April 30, 1990, Respondent Insurance Commissioner Constance B. Foster (Commissioner) also filed preliminary objections to the Society's amend-

ed petition. The preliminary objections were consolidated for resolution. By a published opinion and order of January 11, 1991, the commonwealth court (1) sustained the Attorney General's preliminary objections and dismissed the Society's amended petition with respect to the Attorney General, (2) sustained the Commissioner's preliminary objections as to count 4 of the Society's amended petition, and (3) dismissed the Commissioner's preliminary objections as to counts 1, 2, 3, and 5 of the Society's amended petition for review. *Pennsylvania Medical Society v. Foster*, 137 Pa.Commonwealth Ct. 192, 585 A.2d 595 (1991).[1]

On May 2, 1991, the Society filed a motion for partial summary judgment on counts 2, 3, and 5 of its amended petition for review. Although the motion expressly requests judgment on counts 2, 3, and 5, the motion implicitly seeks summary judgment on all the remaining counts (counts 1, 2, 3, and 5) of the amended petition because count 1 is indisputably subsumed by count 2.[2] The Society's summary judgment motion is now before us for disposition.

## II. RIGHT TO SUMMARY JUDGMENT

A grant of summary judgment pursuant to Pa.R.A.P. No. 1035(b) is appropriate only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue as to any material

1. The commonwealth court dismissed count 4 of the Society's amended petition for review on the ground that Pennsylvania Blue Shield's participation in the determination of reasonable charges for medical services provided to automobile accident victims does not constitute an impermissible delegation of legislative power and therefore does not violate article II, section 1 of the Pennsylvania Constitution.

2. Count 1 is set forth in 25 numbered paragraphs all of which are explicitly incorporated by reference and included in count 2 of the Society's amended petition. Society's March 30, 1990 Amended Petition for Review, para. 26, at 8. In count 1, the Society alleges that newly revised subsection 1797(a) of the Law is unconstitutionally vague and thus violates the due process clauses of the United States Constitution and the Pennsylvania Constitution. In count 2, the Society alleges that subsection 1797(a) will not remain unconstitutionally vague if the Society's proposed interpretations of subsection 1797(a) are accepted.

fact and that the moving party is clearly entitled to judgment as a matter of law. *See, e.g., Marks v. Tasman,* 527 Pa. 132, 589 A.2d 205 (1991); *Boyertown Oil Co. v. Osan Manufacturing Co.,* 356 Pa.Superior Ct. 436, 514 A.2d 938 (1986), *petition for allowance of appeal denied,* 515 Pa. 617, 531 A.2d 426 (1987) (summary judgment standards apply even if summary judgment on whole case or for all the relief asked is improper); *Peters Township School Authority v. United States Fidelity and Guaranty Co.,* 78 Pa.Commonwealth Ct. 365, 467 A.2d 904 (1983); *Pennsylvania Public Utility Commission Bar Association v. Thornburgh,* 62 Pa.Commonwealth Ct. 88, 434 A.2d 1327 (1981), *aff'd,* 498 Pa. 589, 450 A.2d 613 (1982) (propriety of granting summary judgment in declaratory judgment proceeding when prerequisites for obtaining summary judgment have been satisfied).

In the case before us, there do not exist any disputed material facts. The sole issue is whether the Society possesses a clear right to summary judgment as a matter of law on any or all of the three grounds advanced by the Society: (1) the direct patient billing prohibition and the balance billing prohibition of section 1797 violate substantive due process because they are not rationally related to the purpose of Act 6, (2) the direct patient billing prohibition of section 1797 of the Law violates substantive due process because it is expressed in unconstitutionally vague language, and (3) the payment limits in subsection 1797 have been misinterpreted by the Commissioner and must be interpreted as the Society urges in order to construe the language of subsection 1797 in conformity with the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501–1991.[3]

3. In its brief, the Society also contends that section 1797 of the Law is unconstitutionally vague and thus violates substantive due process because it fails to establish priorities among types of insurance policies applicable to an automobile accident victim. Prior to oral argument before this court on the Society's motion for summary judgment, the Commissioner acted to establish priorities. Consequently, at oral argument before this court on the motion for summary judgment, the Society withdrew its contention that section 1797's failure to establish priorities among types of insurance policies appli-

## III. UNCONSTITUTIONAL OVERBREADTH

First, the Society argues that section 1797 of the Law is unconstitutionally overbroad because the direct patient billing prohibition and the balance billing prohibition of section 1797 are not rationally related to the purpose of Act 6 and therefore violate the substantive due process rights of the Society's members, i.e., physicians.

■ "The test for substantive due process in the areas of social and economic legislation is whether the challenged law has a rational relation to a valid state objective(s)." *Novak v. Unemployment Compensation Board of Review,* 73 Pa.Commonwealth Ct. 148, 153, 457 A.2d 610, 612 (1983); *Gambone v. Commonwealth,* 375 Pa. 547, 101 A.2d 634 (1954). An overbroad statute violates substantive due process by depriving a person of a constitutionally protected interest through means which are not rationally related to a valid state objective because they "sweep unnecessarily broadly." *Adler v. Montefiore Hospital Association of Western Pennsylvania,* 453 Pa. 60, 72, 311 A.2d 634, 640 (1973), *cert. denied,* 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Pennsylvania Medical Society.*

### A. Protected Interest

The Society contends that section 1797 of the Law violates physicians' substantive due process rights under the fourteenth amendment of the United States Constitution and article I, section 1 of the Pennsylvania Constitution by unreasonably interfering with physicians' liberty and property interests in the practice of their profession.[4]

cable to an automobile accident victim renders section 1797 unconstitutionally vague.

4. In its brief, the Society also argues that section 1797 violates a patient's right of personal privacy in the choice of a physician. We note that this argument is not foreshadowed in the Society's amended petition for review. We make no ruling regarding the Society's patients' rights argument because we are able to resolve the Society's motion for summary judgment on the basis of the Society's alternate

"It is axiomatic that for due process rights to attach there must first be a deprivation of a property right or other similar interest" which is constitutionally protected. *Ohio Casualty Insurance Co. v. Insurance Department of the Commonwealth of Pennsylvania,* 137 Pa.Commonwealth Ct. 299, 309 n. 7, 585 A.2d 1160, 1165 n. 7 (1991). The fourteenth amendment of the United States Constitution states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." Article I, section 1 of the Pennsylvania Constitution states that "[a]ll men ... have certain inherent and indefeasible rights, among which are those of enjoying and defending ... liberty, of acquiring, possessing and protecting property ... and of pursuing their own happiness."

In *Brady v. State Board of Chiropractic Examiners,* 79 Pa.Commonwealth Ct. 608, 471 A.2d 572, *appeal dismissed,* 506 Pa. 83, 483 A.2d 1376 (1984), we concluded that, after a license to practice a particular profession is acquired, the licensed professional has a protected property right to practice that profession. *Accord Gambone; Pennsylvania Medical Society.* In *Pennsylvania Chiropractic Federation v. Foster,* 136 Pa.Commonwealth Ct. 465, 583 A.2d 844 (1990), and in *Pennsylvania Medical Providers Association v. Foster,* 136 Pa.Commonwealth Ct. 232, 582 A.2d 888 (1990), we acknowledged that the right to practice a profession is also a protected liberty right. *Accord Adler; Gambone.*

■■■ Accordingly, we hold that, within the scope of the fourteenth amendment of the United States Constitution and article I, section 1 of the Pennsylvania Constitution, the Society's members (physicians) possess a protected interest in the practice of their profession. Nevertheless, the right to practice a chosen profession is subject to the lawful exercise of the state's police power to protect the public health, safety, welfare and morals by promulgating statutes

argument regarding the manner in which section 1797 affects physicians' protected property and liberty rights.

which reasonably regulate occupations. *Adler; Gambone; Pennsylvania Medical Society.*

## B.   Valid State Objective

■   To constitute a lawful exercise of the state's police power, a socioeconomic statute must first be directed toward a valid state objective. *Gambone; Novak.*

In *Pennsylvania Chiropractic Federation,* we determined that "restructuring the regulation of motor vehicle insurance in the Commonwealth and reducing the cost of insurance to policy holders" was the legislative purpose of Act 6 and, consequently, of section 1797 of the Law as amended by Act 6. *Id.,* 136 Pa.Commonwealth Ct. at 474, 583 A.2d at 848; *accord Ohio Casualty Insurance Co.* Furthermore, in *Pennsylvania Medical Society,* we reasoned that the regulation and cost reduction of motor vehicle insurance in Pennsylvania pursuant to Act 6 and amended section 1797 of the Law was a legitimate state objective consistent with the Commonwealth's police power to protect and promote the public health, safety and welfare.

■   Therefore, we have held and continue to hold that the motor vehicle insurance regulation and cost reduction purpose of Act 6 and section 1797 of the Law, as amended by Act 6, constitute a valid state objective. However, to withstand a substantive due process challenge, a statute must seek to achieve a valid state objective by means that are rationally related to the objective. *Gambone; Novak.*

## C.   Rational Relationship to Objective

■   "The rational relationship standard of substantive due process by which legislation is judicially measured ... is that the law must have a real and substantial relation to the objects sought to be attained." *O'Donnell v. Casey,* 45 Pa.Commonwealth Ct. 394, 400, 405 A.2d 1006, 1009 (1979). As the Supreme Court of Pennsylvania explained in *Gambone,*

a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained. Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations.

*Id.*, 375 Pa. at 551, 101 A.2d at 637; *Adler; Pennsylvania Medical Society.*

With respect to a physician's direct billing of a patient/insured who was treated as an automobile accident victim or a physician's balance billing of a patient/insured who was treated as an automobile accident victim, section 1797 of the Law states in significant part:

(a) General rule.— .... Providers subject to this section may not bill the insured directly but must bill the insurer for a determination of the amount payable. The provider shall not bill or otherwise attempt to collect from the insured the difference between the provider's full charge and the amount paid by the insurer.

(b) Peer review plan for challenges to reasonableness and necessity of treatment.—

. . . .

(3) Pending determinations by PRO.— .... The insured may not be billed for any treatment, accommodations, products or services during the peer review process.

1. Penultimate Sentence of Subsection 1797(a);
Last Sentence of Subsection 1797(b)(3).

The penultimate sentence in subsection 1797(a) and the last sentence in subsection 1797(b)(3) concern a physician's direct billing of a patient/insured.[5]

**5.** This opinion uses the term "insured" in conformity with section 1702 of the Law, 75 Pa.C.S. § 1702, to signify a person who is covered by a motor vehicle liability insurance policy as:

The Society contends that the penultimate sentence of subsection 1797(a) and the last sentence of subsection 1797(b)(3) are susceptible to only one interpretation with respect to a physician's direct billing of a patient/insured. According to the Society, these segments of section 1797, without exception, require a physician to bill an automobile insurer[6] for medical services provided to a patient/insured whom the physician treated as an automobile accident victim, and, without exception, prohibit a physician from directly billing the patient whom the physician treated as an automobile accident victim. Thus, the Society claims that the penultimate sentence of subsection 1797(a) and the last sentence of subsection 1797(b)(3) are overbroad because they preclude direct patient billing even when a physician cannot determine the existence of applicable automobile insurance coverage or when first-party automobile insurance benefits have been exhausted. Society's Brief at 6.

■ The Commissioner argues that the Society's reading of the penultimate sentence in subsection 1797(a) and the last sentence in subsection 1797(b)(3) is unnecessarily restrictive. *See, e.g.*, the interpretations of section 1797 provided in the Commissioner's Brief at 18–19 and Exhibits B and C thereof which consist of the Commissioner's statement of policy (31 Pa.Code §§ 68.1–.3) published at 20 Pa.B. 2047 (1990) and the Commissioner's proposed rule-making published at 21 Pa.B. 2363 (1991); the Commissioner's newly promulgated regulation at 31 Pa.Code § 69.22.[7] The

(1) An individual identified by name as an insured in a policy of motor vehicle liability insurance.
(2) If residing in the household of the named insured:
(i) a spouse or other relative of the named insured; or
(ii) a minor in the custody of either the named insured or relative of the named insured.
*Id.; accord* 75 Pa.C.S. § 1705(f) as amended by Act 6.

6. The term "insurer" is defined in section 1702 of the Law, as a "motor vehicle liability insurer." This opinion will refer to a motor vehicle liability insurer as an "automobile insurer."

7. In accordance with section 506 of what is popularly known as the Commonwealth Documents Law, 45 Pa.C.S. § 506, we take judicial notice of the Commissioner's regulations at 31 Pa.Code §§ 69.1–.55

Commissioner asserts that any overbreadth problem with respect to the direct patient billing prohibition language of section 1797 is averted by the Commissioner's regulation at 31 Pa.Code § 69.22 which implements and interprets section 1797 of the Law to allow several instances in which a physician is excused from billing an automobile insurer and may directly bill a patient.[8]

For example, the Commissioner's regulations at subsections 69.22(d) and 69.22(e) permit direct patient billing when an automobile insurer has advised that the patient's automobile insurance benefit limits have been exceeded or exhausted. Additionally, the Commissioner's regulation at subsection 69.22(h) permits direct patient billing when no portion of the physician's bill is payable by an automobile insurer. In her appellate brief, the Commissioner has interpreted her regulation at subsection 69.22(h) to mean that the patient, directly, or the patient's "secondary carrier, including a health insurance carrier, may be billed when benefits under all applicable coverages have been exhausted *or*, after reasonable inquiry, when payment is unavailable to a provider [i.e., physician] under automobile insurance coverage." Commissioner's Brief at 18–19 (emphasis in original).

Restated in its simplest terms, section 1797, as implemented by the Commissioner's regulation at 31 Pa.Code § 69.22, mandates that automobile insurance be the first source of payment for medical expenses stemming from an automobile accident. Accordingly, section 1797's direct patient billing prohibition, as implemented in the Commission-

which were published at 21 Pa.B. 5601 (1991) to explain and implement Act 6 (specifically, section 1797 of the Law) and which substantially incorporated the Commissioner's earlier statement of policy at 20 Pa.B. 2047 (1990) and proposed rule-making at 21 Pa.B. 2363 (1991). *Roskwitalski v. Reiss,* 266 Pa.Superior Ct. 29, 402 A.2d 1061 (1979) (judicial notice of Pennsylvania Code).

8. The interpretation of a statute by the agency charged with the statute's administration is entitled to great weight and should not be disregarded unless it is clearly erroneous. *Carol Lines, Inc. v. Pennsylvania Public Utility Commission,* 83 Pa.Commonwealth Ct. 393, 477 A.2d 601 (1984).

er's regulation at 31 Pa.Code § 69.22, is arguably rationally related to Act 6's purpose of regulating and reducing the cost of automobile insurance because section 1797 establishes payment priorities among different sources of payment for medical services and may thereby help curtail duplication of recovery. *See* Commissioner's Brief at 3.

As interpreted by the Commissioner to include the prerequisite of a physician's *reasonable inquiry* into automobile insurance coverage for a patient, the direct patient billing prohibition of section 1797 is arguably not unconstitutionally overbroad because it pertains only to situations where a patient can reasonably be identified as an insured within the meaning of the Law. By construing section 1797 to allow direct patient billing in certain circumstances after a physician has made a *reasonable inquiry* into the existence of applicable automobile insurance coverage for the medical services rendered to the patient, the Commissioner has provided for billing contingencies where a patient's injuries are incurred in an automobile accident but the patient's status as an insured cannot be readily ascertained.

Because we conclude that the Society is not clearly entitled as a matter of law to have its interpretation of subsection 1797's direct patient billing prohibition prevail, we are unable to grant the Society summary judgment on this issue.

### 2. Last Sentence of Subsection 1797(a).

█ The last sentence of subsection 1797(a) concerns a physician's balance billing of a patient/insured, i.e., billing of a patient/insured for the difference between the physician's full charge for the medical services provided and the payment limits listed in the first sentence of subsection 1797(a) of the Law.

The Society and the Commissioner agree, and we conclude, that the last sentence of subsection 1797(a) is susceptible to only one interpretation with respect to a physician's balance billing of a patient/insured. Under this segment of section 1797, a physician may not engage in balance billing

but, rather, must accept as full compensation the applicable payment limit stated in the Law, namely, 110% of the prevailing charge at the 75th percentile; 110% of the applicable fee schedule, the recommended fee or the inflation index charge; or 110% of the diagnostic-related groups (DRG) payment; whichever pertains to the specialty service involved, determined to be applicable in this Commonwealth under the Medicare program for comparable services at the time the services were rendered, or the provider's usual and customary charge, whichever is less. *E.g.*, the Commissioner's Brief at 29–30 and Exhibits B, C, and D thereof which consist of the Commissioner's policy statement, proposed rule-making and the affidavit of Albert Zezulinski; the Commissioner's newly promulgated regulations at 31 Pa. Code §§ 69.21–.22.

The Society argues that section 1797's balance billing prohibition is not rationally related to Act 6's purpose of regulating and reducing the cost of automobile insurance because balance billing does not affect an automobile insurer's liability. Society's Brief at 20.

A hypothetical will illustrate the Society's perception of balance billing. Assume that a physician directly bills a patient/insured for $11,000 in medical services that were provided to the patient/insured as an automobile accident victim. Assume that the patient/insured informs the physician that the patient/insured will pay the physician's total $11,000 bill. Assume that the patient/insured has automobile insurance benefits in the amount of $5,000. Assume that, in accordance with the applicable payment method enumerated in section 1797 of the Law, the automobile insurer's maximum payment limit would be $6,000. Construing together the terms of the automobile insurance policy and the payment method limit in section 1797,[9] the automobile insurer would be obligated to pay $5,000 in automobile accident insurance benefits, i.e., the amount

9. *See, e.g., Boone v. Stonewall Insurance Co.,* 382 Pa.Superior Ct. 104, 554 A.2d 968 (1989) (interpretation of an automobile insurer's payment obligations under an insurance policy and pre-Act 6 provisions of the Law).

consistent both with its duties under its policy covering the patient/insured and with the payment limits of section 1797 of the Law. Whether the automobile insurer pays $5,000 directly to the physician or directly to the patient/insured, the automobile insurer's total payment obligation remains $5,000. Whether or how the patient/insured pays the physician's total $11,000 bill or the $6,000 balance of the bill which is not covered by automobile insurance, the automobile insurer's total payment obligation remains $5,000.

The Commissioner contends that section 1797's balance billing prohibition is rationally related to Act 6's objective of regulating and reducing the cost of automobile insurance because the balance billing prohibition is "an accepted legislative means to control the costs of medical benefits and to ensure that the savings achieved by the payor [i.e., the automobile insurer] are not then shifted to the persons receiving the medical service [i.e., the patients/insureds]." Commissioner's Brief at 25. To support her contention that the General Assembly may use Act 6 to preclude a physician's balance billing of a patient/insured, the Commissioner relies on federal court cases interpreting various aspects of Subchapter XVIII of the Social Security Act (commonly known as the Medicare Act) which provides federal health insurance for the aged and disabled, 42 U.S.C. §§ 1395–1395ccc.

Noting that section 1797 of the Law refers to the Medicare Act compensation allowances as a payment guideline for Act 6, the Commissioner analogizes the present Act 6 case to *American Society of Cataract and Refractive Surgery v. Bowen,* 725 F.Supp. 606 (D.D.C.1989), and *Whitney v. Heckler,* 603 F.Supp. 821 (N.D.Ga.1985), *aff'd,* 780 F.2d 963 (11th Cir.1986), *cert. denied sub nom. Whitney v. Bowen,* 479 U.S. 813, 107 S.Ct. 65, 93 L.Ed.2d 23 (1986), which construed balance billing provisions of the Medicare Act. Both cases involved physicians who fell within the Medicare program's definition of non-participating physicians. As explained in these cases and in 42 U.S.C. § 1395u, a non-participating Medicare physician accepts, on

a claim-by-claim basis, assignment of a patient/Medicare beneficiary's entitlement to reimbursement under the Medicare Act whereas a participating Medicare physician accepts, on a twelve-month basis by agreement with the United States Secretary of Health and Human Services, assignment of entitlement to reimbursement under the Medicare Act for all services furnished by the participating physicians to all patients who are Medicare beneficiaries. Thus, a non-participating Medicare physician agrees to accept, as compensation in full for medical services to a patient/Medicare beneficiary, the payment amount specified in the Medicare Act.

However, as we stated in *Pennsylvania Medical Society,* we are mindful of important differences between the Medicare Act and Act 6. The Medicare Act regulates receipt of government funds (a federal entitlement),[10] *e.g., American Society of Cataract and Refractive Surgery;* 42 U.S.C. § 1395d, whereas Act 6 "attempts to regulate private medical benefits," i.e., private funds. *Pennsylvania Medical Society,* 137 Pa.Commonwealth Ct. at 203, 585 A.2d at 600.

Additionally, the Medicare Act and Act 6 are not designed to accomplish the same objective. The Medicare Act was promulgated under the General Welfare Clause, article I, section 8, clause 1 of the United States Constitution, for the purpose of making affordable *health care and health insurance* available to older and disabled members of the national population who might otherwise be financially unable to obtain medical services. *E.g., New York State Ophthalmological Society; American Society of Cataract and Refractive Surgery.* Accordingly, federal courts have upheld the Medicare Act's prohibition on a physician's balance billing of a patient/Medicare beneficiary for medical

---

10. It is beyond cavil that the government may impose conditions upon the expenditure and receipt of its government funds. *E.g., New York State Ophthalmological Society v. Bowen,* 854 F.2d 1379 (D.C.Cir. 1988), *cert. denied sub nom. New York State Ophthalmological Society v. Sullivan,* 490 U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989); *American Society of Cataract and Refractive Surgery;* 42 U.S.C. §§ 1395f, 1395u, and 1395mm.

services not covered by Medicare monies on the ground that such a cost containment provision is rationally related to the Medicare Act's valid objective of assuring affordable health care and health insurance. *E.g., Whitney.*

Unlike the Medicare Act, Act 6 was not promulgated as a comprehensive health care and health insurance statute. Act 6 was passed as an amendment to the Vehicle Code, 75 Pa.C.S. §§ 101–9701, pursuant to which the General Assembly imposes conditions on the privilege of driving in Pennsylvania. *Commonwealth v. Gallagher,* 3 Pa.Commonwealth Ct. 371, 283 A.2d 508 (1971). In particular, Act 6 was promulgated as an amendment to that chapter of the Vehicle Code known as the Motor Vehicle Financial Responsibility Law which imposes upon registrants of motor vehicles in Pennsylvania the requirement of obtaining automobile insurance or approval to self-insure. Section 1782 of the Law, 75 Pa.C.S. § 1782. The purpose of Act 6 is to regulate automobile insurance in Pennsylvania in a manner that makes affordable *automobile insurance* available, and we have held that this is a valid state objective. *Pennsylvania Medical Society; Ohio Casualty Insurance Co.; Pennsylvania Chiropractic Federation.*

Because we conclude that the Society is not clearly entitled as a matter of law to our adoption of its interpretation of the relationship between the purpose of Act 6 and section 1797's balance billing prohibition, we are unable to grant the Society summary judgment on this issue.

## IV.  UNCONSTITUTIONAL VAGUENESS

Alternatively, the Society asserts that the language in the penultimate sentence of subsection 1797(a) and the last sentence of subsection 1797(b)(3) articulating the direct patient billing prohibition is unconstitutionally vague because it does not address all the billing contingencies likely to occur when a patient's status as an insured under the Law is not readily determinable. Society's Brief at 6. However, citing *Pennsylvania Medical Society,* the Society concedes in its appellate brief that any linguistic vagueness

regarding the direct patient billing prohibition of section 1797 may be eliminated by the Commissioner's promulgation of regulations implementing section 1797 of the Law. Society's Brief at 9.

Having taken judicial notice of the Commissioner's newly promulgated regulation at 31 Pa.Code § 69.22 which interprets section 1797 of the Law, we conclude that the Commissioner's regulation eviscerates the Society's contention regarding the purported unconstitutional vagueness of the direct patient billing prohibition. All the billing contingencies listed in the Society's brief are accommodated by the Commissioner's regulation at 31 Pa.Code § 69.22 which the Commissioner has interpreted to include the prerequisite that a physician make a *reasonable inquiry* about available automobile insurance coverage before directly billing a patient.

Consequently, we hold that the Society is not entitled as a matter of law to summary judgment on this issue.

## V. PAYMENT LIMITS

■ The first sentence in subsection 1797(a) concerns the applicable payment limits for medical services provided to a patient/insured who was treated as an automobile accident victim. The Society challenges the Commissioner's interpretation of the phrase "prevailing charge at the 75th percentile" which appears in subsection 1797(a)'s recitation of payment limits.

In pertinent part, subsection 1797(a) states that payment for medical services provided to a patient/insured who was treated as an automobile accident victim, shall not be:

in excess of 110% of the prevailing charge at the 75th percentile; 110% of the applicable fee schedule, the recommended fee or the inflation index charge; or 110% of the diagnostic-related groups (DRG) payment; whichever pertains to the specialty service involved, determined to be applicable in this Commonwealth under the Medicare program for comparable services at the time the services were rendered, or the provider's usual and customary

charge, whichever is less. The General Assembly finds that the reimbursement allowances applicable in the Commonwealth under the Medicare program are an appropriate basis to calculate payment for treatments, accommodations, products or services for injuries covered by liability or uninsured and underinsured benefits or first party medical benefits insurance.... If a prevailing charge, fee schedule, recommended fee, inflation index charge or DRG payment has not been calculated under the Medicare program for a particular treatment, accommodation, product or service, the amount of the payment may not exceed 80% of the provider's usual and customary charge.

The Commissioner contends that the phrase " 'prevailing charge at the 75th percentile,' as defined by the Medicare legislation and implementing regulations, is a term that refers to *one* of four possible payment allowances." Commissioner's Brief at 41 (emphasis in original). The Commissioner argues that her interpretation is proper because the subsection 1797(a) phrase "prevailing charge at the 75th percentile" must be construed together with the subsection 1797(a) sentence which states: "The General Assembly finds that the reimbursement allowances applicable in the Commonwealth under the Medicare program are an appropriate basis to calculate payment for treatments, accommodations, products or services for injuries covered by liability or uninsured and underinsured benefits or first party medical benefits insurance." The Commissioner asserts that, in the quoted sentence, the reference to Medicare allowances is intended to signify four possible Medicare payment allowances which, the Commissioner claims, are included in the Medicare Act's definition of the phrase "prevailing charge at the 75th percentile."

The Commissioner maintains that the four possible Medicare payment allowances purportedly subsumed by the phrase "prevailing charge at the 75th percentile" are identified in the affidavit of Albert Zezulinski upon whose state-

ments the Commissioner relies exclusively.[11] In his affidavit, Zezulinski declares that the Medicare payment allowance for medical treatment is the lowest of the following four possible allowances:

(a) the medical provider's actual charge for the service, *i.e.,* what the medical provider seeks to charge this patient at this time; (b) the medical provider's customary charge for the service, *i.e.,* the uniform amount charged in the majority of cases by an individual provider for a single service during the previous year; or (c) the prevailing charge for the service according to a fee profile developed by the Medicare carrier in the particular state, *i.e.,* the charge at the 75th percentile of providers' customary charges for a specific service rendered by providers in the same specialty and the same locality over a given period of time, calculated by the carrier, which is sufficient to include the customary charges of 75% of the providers; and (d) what the carrier would pay for a particular service on behalf of its other policyholders or subscribers that are not Medicare beneficiaries.

Commissioner's Brief, Exhibit D, Affidavit of Albert Zezulinski, para. 20, at 6–7.[12]

The Society counters that the Commissioner's explanation of the four possible Medicare payment allowances purportedly included in the phrase "prevailing charge at the 75th percentile" is inconsistent with the definition of the phrase "prevailing charge at the 75th percentile" in the Medicare regulations but, instead, is consistent with the definition of

11. Zezulinski is the president of Century Consultants, a firm which advises health care providers on issues of payment and peer review. Commissioner's Brief, Exhibit D, Affidavit of Albert Zezulinski, para. 1, at 1.

12. The word "carrier" as used in Zezulinski's affidavit refers to Pennsylvania Blue Shield which, pursuant to a contract with the federal Health Care Financing Administration, administers the Medicare program in Pennsylvania. Commissioner's Brief, Exhibit D, Affidavit of Albert Zezulinski, paras. 13–15, at 5; *see* 42 C.F.R. § 400.200. The Commissioner has not included any affidavits from Pennsylvania Blue Shield.

the phrase "reasonable charge" in the Medicare regulations. 42 C.F.R. §§ 405.501, 405.502, and 405.511.

The Society observes that the expression "reasonable charge" has been utilized by the General Assembly in the Health Care Practitioners Medicare Fee Control Act, Act of July 10, 1990, P.L. 352, 35 P.S. §§ 449.31–.36, which declares that Medicare beneficiaries cannot be asked to pay "an amount in excess of the *reasonable charge* for the service provided, as determined by the United States Secretary of Health and Human Services." Section 2 of the Health Care Practitioners Medicare Fee Control Act, 35 P.S. § 449.32(b) (emphasis added).

We recognize that, where the General Assembly has varied the wording in two similar statutory provisions, the variance may signify a difference in legislative intent. *Corley v. Pennsylvania Board of Probation and Parole*, 83 Pa.Commonwealth Ct. 529, 478 A.2d 146 (1984). Therefore, the General Assembly's choice of the phrase "prevailing charge at the 75th percentile" in subsection 1797(a) of the Law and the distinct expression "reasonable charge" in the Health Care Practitioners Medicare Fee Control Act may indicate the General Assembly's intent to use two different payment standards in the two statutes. The General Assembly's ability to utilize two different payment standards in the two statutes is underscored by the fact that the Health Care Practitioners Medicare Fee Control Act is premised upon a federal entitlement under the Medicare program whereas Act 6 involves the payment of private funds relating to private medical benefits.

Citing the federal Medicare Act regulations at 42 C.F.R. § 405.502–.504 and sections 5020 and 10046 of the Medicare Carrier's Manual,[13] the Society construes the phrase "prevailing charge at the 75th percentile" to signify a rate of 75 percent of the customary charges made for similar services in the same locality during the fiscal year (July 1 through

**13.** *See American Ambulance Service of Pennsylvania v. Sullivan,* 911 F.2d 901 (3d Cir.1990) (explanation of usefulness of Medicare Carrier's Manual).

June 30) preceding the calendar (fee screen) year (January 1 through December 31) in which medical treatment was furnished. *E.g.,* 42 C.F.R. § 405.504(a)(2)(ii)(A).

Because we conclude that the Society is not clearly entitled as a matter of law to our adoption of its interpretation of the subsection 1797(a) phrase "prevailing charge at the 75th percentile," we are unable to grant the Society summary judgment on this issue.

## VI. CONCLUSION

Accordingly, we deny the Society's motion for summary judgment. As a result of our denial of summary judgment, a praecipe for trial may be filed by either party.

## ORDER

AND NOW, April 29, 1992, pursuant to Pa.R.C.P. No. 1035, the motion of the Pennsylvania Medical Society for summary judgment in the above-captioned case is hereby denied.

COLINS, J., concurs in result only.

CRAIG, President Judge, concurring.

This court should not understate the analogous relationship between the Medicare Act[1] and Act 6.[2]

The Commissioner argues that federal decisions upholding the constitutionality of Medicare's prohibition of physician balance-billing of the patient/insured supports Act 6's prohibition of physician balance-billing of a patient/insured.

Of course, there are important differences between the Medicare Act and Act 6, but there are also crucial parallels.

Although in *Pennsylvania Medical Society v. Foster,* 137 Pa.Commonwealth Ct. 192, 585 A.2d 595 (1991), this court characterized Medicare as a "federal entitlement," the court in that case approved the Commissioner's use of Medicare

1. 42 U.S.C. §§ 1395–1395ccc.
2. Act of February 7, 1990, P.L. 11, Act No. 90–6.

rates as guideposts in determining medical providers' fees under Act 6, as not constituting an improper delegation of rulemaking to the federal government.

Act 6 is indeed aimed at reducing insurance costs by controlling insurance payments resulting from motor vehicle accidents, including medical payments.

Although the scope of Medicare is broader than Act 6, Medicare, like Act 6, is also an *insurance* program, with the federal government acting as the insurer.

In the Medicare Act, Medicare is referred to as an "insurance program," 42 U.S.C. § 1395(d), entitling individuals to "insurance benefits." 42 U.S.C. § 1395(a).

Furthermore, in *Whitney v. Heckler*, 780 F.2d 963 (11th Cir.1986), the court there examined the background of Medicare and stated:

> In 1965, Congress enacted the Medicare program ... This program is divided into two parts. Part A provides reimbursement for covered hospital and related services ... Part B establishes a voluntary program of supplemental medical insurance benefits for certain medical services....
>
> ....
>
> ... Medicare enrollees obtain benefits in return for the payment of monthly premiums in an amount determined by the Secretary of Health and Human Services ... These premiums and contributions make up the Federal Supplementary Medical Insurance Trust Fund....

*Whitney*, 780 F.2d at 965.

Thus, the Commissioner's reliance upon the Medicare Act in interpreting Act 6 is not misplaced because Medicare, like Act 6, is legislation designed to regulate insurance costs.

McGINLEY, Judge, dissenting.

I respectfully dissent on the basis that I believe the prohibitions against direct patient billing and balance billing set forth in 75 Pa.C.S. § 1797(a) are not rationally related to

Act 6's purpose of effectively reducing the cost of automobile insurance.[1]

The prohibitions against direct patient billing in 75 Pa. C.S. § 1797(a) and (b), including the exceptions set forth in 31 Pa.Code § 69.22, are overbroad because they do not allow a physician to bill a patient when the identity of the responsible insurer cannot be determined (cases involving liability or uninsured/underinsured coverage). Such a result violates a physician's right to due process by effectively denying the physician any meaningful opportunity to obtain compensation until legal responsibility is determined.

I also believe that the prohibition against balance billing is not rationally related to the stated objectives of Act 6. Unlike Medicare which the majority notes involves the expenditure and receipt of government funds, Act 6 regulates automobile insurance contracts between private insurance companies and their policy holders. Under the basic principles of contract law the consideration to the insured from the insurer is its promise to pay under the terms of the policy in the event of a loss, including medical expenses, up to the applicable policy limits in return for the policy holder's payment of the premium. Traditionally, if there are reduced obligations on the insurer's part, the consideration to be paid by the policy holder is likewise reduced. 75 Pa.C.S. § 1797(a), which limits a physician's charges to 110% of the prevailing charge at the 75th percentile (Medicare rate),[2] is the route chosen by the legislature to reduce premiums, effectively forcing the physician to absorb the difference, or the amount saved by the insurer and its policy holders. This forced participation by the physician in a private contract between the insurer and its policy holder is simply taking from Peter to pay Paul.

1. In *Pennsylvania Chiropractic Examiners v. Foster*, 136 Pa.Commonwealth Ct. 465, 474, 583 A.2d 844, 848 (1990), we determined that the legislature intended to restructure the regulation of motor vehicle insurance and reduce the cost of insurance to policy holders in the Commonwealth.

2. I note that the physician may charge his usual and customary charge or actual charge if lower than the Medicare rate.

I agree with the Society's position that Act 6's limitations on a physician's charges will not affect an automobile insurer's liability. *See* Majority's Opinion at 640. Accordingly, I would hold that the prohibitions against direct patient billing and balance billing in 75 Pa.C.S. § 1797(a) and (b) lack a legally rational relationship to the cost of automobile insurance and thus cannot be saved. On this ground, I would declare Act 6 unconstitutional.